**36 So.2d 34**

## JONES v. SOUTHERN NATURAL GAS CO.
### No. 38476.

April 26, 1948.

Rehearing Denied June 1, 1948.

Thompson, Thompson & Sparks, of Monroe, for defendant-appellant.

Carey J. Ellis, Jr., of Rayville, for plaintiff-appellee.

O'NIELL, Chief Justice.

On September 8, 1943, Mrs. Mary Ellis Jones leased to L. M. Calhoun, Jr., for the production of oil, gas and other minerals, a tract of land described as follows:

"The Southeast quarter of the Southwest quarter (SE¼ of SW¼) and the South half of the Southeast quarter (S½ of SE¼) Section One (1), Township Thirteen (13) North, Range Seven (7) East. The Southwest quarter of the Southwest quarter (SW¼ of SW¼), the North half of Southeast quarter of Southwest quarter (N½ of SE¼ of SW¼) and the North half of South half of Southeast quarter (N½ of S½ of SE¼) Section Six (6). The South half of Southwest quarter of Northwest quarter (S½ of SW¼ of NW¼), the Southeast quarter of the Northwest quarter (SE¼ of NW¼) and the Southwest quarter (SW¼) of Section Five (5). The Northeast quarter of the Northwest quarter (NE¼ of NW¼) Section Eight (8), Township Thirteen (13) North, Range Eight East. All of the above containing in the aggregate Five Hundred Eighteen and Eighty two one-hundredths (518.82) acres, more or less."

The consideration paid by Calhoun for the lease was $518.82 as stated in the lease. It contained the usual declaration that for all of the purposes of the lease the land described should be treated as containing 518.82 acres, even though it might actually contain more or less acreage. The primary term of the lease was ten years. The act contained also the following clause:

"If operations for drilling are not commenced on said land on or before one year from this date, the lease shall then terminate as to both parties unless on or before such anniversary date lessee shall pay or tender to lessor or to the credit of lessor in Richland State Bank at Rayville, Louisiana (which bank and its successors are lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Five Hundred Eighteen and 82/100 dollars ($518.82) (herein called rental) which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payments or tenders annually the commencement of drilling operations may be further deferred for successive periods of (12) months each during the primary term. The payment or tender of rental may be made by the check or draft of lessee mailed or delivered to lessor or to said bank on or before such date of payment. * * * Lessee, or any assignee hereunder, may at any time execute and deliver to lessor, or to the depository above named, or place of record, a release or releases covering any portion or portions of the premises held by him, and thereby surrender this lease as to such portion or portions, and thereafter the rentals payable by him shall be reduced proportionately."

The lease provided that the rights of either party thereunder might be assigned in whole or in part, and in that connection the act contained the following clause:

"In event of assignment of this lease as to a segregated portion of said land, the

rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder."

On July 31, 1944, Calhoun assigned the lease to the Southern Natural Gas Company, so far as it covered the land described as follows:

"The South half of Southeast quarter (S½ of SE¼) Section 1, Township 13 North Range 7 East; The Southwest quarter of Southwest quarter (SW¼ of SW¼) Section 6; The South half of Southwest quarter of Northwest quarter (S½ of SW¼ of NW¼), the Northwest quarter of Southwest quarter (NW¼ of SW¼) and the East half of Southwest quarter (E½ of SW¼) Section 5; The Northeast quarter of Northwest quarter (NE¼ of NW¼) Section 8, Township 13 North Range 8 East, containing 300 acres, more or less."

On August 24, 1944, the Southern Natural Gas Company mailed its check to the Richland State Bank for $300 accompanied by a blank receipt for the bank to sign, declaring that the check for $300 was in full payment of all delay rentals for the period from September 8, 1944, to September 8, 1945, as per the terms of the oil and gas and mineral lease executed by Mrs. Mary Ellis Jones in favor of L. M. Calhoun, Jr., and subsequently partially assigned to the Southern Natural Gas Company to the extent of 300 acres, more or

less, and particularly described in the receipt as follows:

"S½ of SE¼ Sec. 1, Twp. 13 North, Range 7 East; SW¼ of SW¼ Section 6; S½ of SW¼ of NW¼; NW¼ of SW¼ and E½ of SW¼ Sec. 5; NE¼ of NW¼ Section 8, Township 13 North, Range 8 East."

The receipt contained a citation of the conveyance book and page where the lease was recorded, and concluded with the statement that the $300 was for the credit of Mrs. Mary Ellis Jones. The cashier of the Richland State Bank signed the receipt and retained it in the files of the bank, and returned a copy to the Southern Natural Gas Company. At the same time he mailed a deposit slip for the $300 to Mrs. Jones declaring that the slip was a duplicate and that the amount of $300 was deposited to her credit by the Southern Natural Gas Company. Mrs. Jones' checking account with the bank was carried in the name of Mrs. W. L. Jones. She had no checking account in the name of Mrs. Mary Ellis Jones; but the bank, knowing that Mrs. W. L. Jones and Mrs. Mary Ellis Jones were one and the same individual, placed the deposit of $300 to the credit of Mrs. W. L. Jones. The duplicate deposit slip which was mailed to her did not contain a description of the 300 acres of land, but the receipt which was sent to the bank by the Southern Natural Gas Company with the check for $300 showed upon its face that if each of the sections referred to contained

the regulation area of 640 acres, the 7½ quarter-quarter sections described in the receipt contained exactly 300 acres.

Mrs. Jones made no complaint of there being a shortage in the payment of the delay rental but continued to draw against her checking account in which the bank had deposited the $300.

On August 11, 1945, the Southern Natural Gas Company again deposited $300 in the Richland State Bank to the credit of Mrs. Mary Ellis Jones, to pay the delay rental for the period from September 8, 1945, to September 8, 1946. The remittance was accompanied by a statement of the Southern Natural Gas Company to the effect that the payment was made for the purpose of continuing in force the mineral lease dated September 8, 1943, executed by Mrs. Jones in favor of L. M. Calhoun, Jr., so far as it covered 300 acres in the sections mentioned in the assignment by Calhoun to the Southern Natural Gas Company. The cashier of the bank signed the receipt which accompanied the remittance and returned the receipt to the Southern Natural Gas Company, and at the same time sent to Mrs. Jones a deposit slip for the $300. For some reason which is not explained in the testimony the bank opened a new account in the name of Mrs. Mary Ellis Jones, instead of depositing the $300 to the credit of the account of Mrs. W. L. Jones, as the bank had done with the first deposit of $300.

On September 10, 1945, that is to say, on the second day after the expiration of the time in which the delay rental should have been paid, according to the terms of the lease, Mrs. Jones wrote to the Southern Natural Gas Company saying that inasmuch as the company had failed for two years to pay the amount necessary to keep alive the lease which the company had bought from L. M. Calhoun, Jr., Mrs. Jones requested the company to let her have a release so that she could record it. The company replied that the delay rentals had been paid promptly on the 300 acres on which the lease was assigned by Calhoun to the company; and the company in its reply enclosed photostatic copies of the receipts of the bank, showing that the $300 delay rentals had been paid promptly, for the periods from September 8, 1944, to September 8, 1945, and from September 8, 1945, to September 8, 1946. In the company's reply to Mrs. Jones the land on which the lease was assigned by Calhoun to the company was described by government subdivisions, showing that there were 7½ quarter-quarter sections; which showed that the area of the land was exactly 300 acres, and that the delay rental therefore was $300 for each year, if the sections contained the regulation area of 640 acres. Mrs. Jones again wrote to the Southern Natural Gas Company, saying, this time, that the land on which the lease had been assigned by Calhoun to the company contained considerably more than 300 acres,

and that she was making the demand for a cancellation of the lease under the provisions of Act No. 168 of 1920. But she did not inform the company of the amount of the excess area of the land on which the lease was assigned by Calhoun to the company. On October 1, 1945, the Southern Natural Gas Company, replying to Mrs. Jones' letter of September 29, furnished her a list of the 7½ quarter-quarter sections on which Calhoun had assigned the lease to the company, which list showed that the total area described in the assignment was exactly 300 acres, assuming that the sections referred to contained the regulation area of 640 acres.

On October 3, 1945, Mrs. Jones replied to the company's letter of October 1, and in her reply she insisted that the area of the land on which the lease was assigned by Calhoun to the company exceeded 300 acres. But still she did not disclose the extent of the excess of the acreage. She informed the company that according to her lease she should receive $518.82 for the delay rental for each year, and that in fact she had only received $480 from all of the leaseholders. In this last letter of Mrs. Jones she demanded that the company furnish her with a release of the lease on the area described in the assignment by Calhoun to the company within ten days from the date of her first letter. Subsequently, on a date not stated in the letter, Mrs. Jones explained that when she said she had received $480 from all claimants,

she did not mean that she had actually received the $480 but meant that that amount had been deposited to her credit in the Richland State Bank, and that she had not accepted any part of it. Evidently, she had reference to the delay rental for the period from September 8, 1945, to September 8, 1946. She stated that although the bank had been designated as her agent for the receipt of the delay rentals, the bank was only authorized to receive the correct amount and could not bind her by receiving a less amount than that which was due her. She stated also that if the company desired to withdraw the "partial payment," as she called it, from the bank, the company should call upon the bank to return the money. On December 19, 1945, the Southern Natural Gas Company wrote to Mrs. Jones saying that she had informed the company that the assignment which Calhoun had made to the company covered 322.629 acres instead of 300 acres. The company, in its letter to Mrs. Jones, again described in detail the subdivisions comprising the so-called 300 acres, described in the assignment which Calhoun had made to the company. In this last letter which the company wrote to Mrs. Jones the company stated that in view of her representation that the exact area of the land on which the lease was assigned by Calhoun to the company was 322.629 acres, the company was enclosing in its letter the company's check payable to her order for $45.26 to cover the additional rental which she was claiming. In its letter to Mrs.

Jones the company insisted that the payment of the additional $45.26 was not to be construed as an admission that the company had not paid the delay rental in full for each year. That letter was answered by Mrs. Jones' attorney on January 29, 1946, notifying the Southern Natural Gas Company that all previous offers made by her were thereby withdrawn and that, unless an immediate cancellation of the lease so far as it affected the land on which it had been assigned to the company was furnished, it would be necessary to file suit.

The suit was filed on March 1, 1946, and under the provisions of Act No. 168 of 1920, the plaintiff prayed not only that the lease should be adjudged forfeited so far as it affected the land on which it was assigned to the Southern Natural Gas Company (alleged by the plaintiff to contain 322.63 acres), but also that she should recover of and from the defendant $500 for her attorney's fee under the provisions of Act No. 168 of 1920. The act provides that if a lessee holding a mineral lease shall fail or refuse to furnish the lessor a written cancellation within ten days after demand, and if the lease should be adjudged forfeited, the lessee shall be liable for a reasonable attorney's fee. The district court gave judgment for the plaintiff, adjudging the lease forfeited so far as it affected the alleged 322.63 acres, and condemning the defendant to pay the plaintiff $500 attorney's fee. The defendant is appealing from the decision.

The defendant, in its answer to the suit, contended that the alleged 300-acre tract on which the lease had been assigned to it by Calhoun in fact contained 300.56 acres. Hence the defendant invoked the maxim de minimis non curat lex.

It appears that two surveyors testified as witnesses for the plaintiff that they had computed the area of the 7½ quarter-quarter sections described in the assignment made by Calhoun to the Southern Natural Gas Company. One of these witnesses testified that his computation showed that the area was 322.82 acres, and the other witnesses testified that his computation showed that the area was 323.23. It appears that these two witnesses computed the area of each quarter-quarter section by dividing the area of each section, as stated in the legend on the official plat, by the number 16, that being the number of quarter-quarter sections in each section. Another surveyor, as a witness for the defendant, testified that he had made the computation according to the Manual of Instructions for the Survey of the Public Lands of the United States, and that his computation showed that the area of the 7½ quarter-quarter sections was exactly 300.56 acres. If we should accept that computation as correct, in comparison with the calculation made by the two surveyors who testified for the plaintiff, we might feel obliged to apply the maxim de minimis non curat lex. On the other hand, if we should accept as correct the area contended for by

the plaintiff, 322.63 acres, we would have some doubt about the application of the maxim, because, accepting that figure as the correct area, the shortage in the payment of the annual rental was 7½ per cent of the amount which should have been paid. The rule which is founded upon the maxim de minimis non curat lex is so indefinite that we prefer to rest our decision upon a more substantial basis. We refer to these slight differences in the computations made by the three surveyors, respectively, to demonstrate how likely it was that a mistake might be made in computing the amount of the annual rental on the so-called 300 acres described in the assignment made by Calhoun to the Southern Natural Gas Company. The requirement was that the amount should bear the same ratio to $518.82 as the area of the acreage described in the assignment bears to the total area of 518.82 acres described in the original lease. In that respect this case is different from one where the lessor has stated in the lease, in dollars and cents, the exact amount of the annual rental which must be paid by the lessee, and where there has been no assignment of a segregated part of the land covered by the original lease.

 The defendant in its answer to this suit pleaded that the plaintiff, by accepting the $300 deposited by the defendant in the Richland State Bank, on August 25, 1944, knowing that the defendant in good faith believed that the amount was sufficient to pay in full the delay rental from September 8, 1944, to September 8, 1945, and by retaining in her bank account the $300 paid by the defendant on August 11, 1945, knowing that the defendant in good faith believed that that amount was sufficient to pay in full the delay rental for the year beginning September 8, 1945, and ending September 8, 1946, was estopped from demanding a forfeiture of the lease for nonpayment of the delay rentals in full. It is argued for the plaintiff that the estoppel cannot prevail in this case because she was, at the time of the payment of the rentals, ignorant of the fact that the amount was insufficient. The important fact, however, is that she knew that the party making the payment believed that the amount was sufficient, and had good reason to believe it was sufficient. If the plaintiff had known that the amount was insufficient and had knowingly accepted the $300 in full payment for the delay rental due to her, she would have been estopped from claiming now the alleged shortage of $22.63. There is nothing to prevent a creditor from accepting from his debtor in full payment of the debt due an amount less than is due, provided, of course, that the acceptance is made with full knowledge that it is not the full amount due, and with the intention that it shall discharge the debt. The defendant in this case is not pleading that the plaintiff became estopped from demanding the alleged shortage, but is pleading that she is estopped from demanding the forfeiture, without having informed

the defendant of the shortage and without having given the defendant an opportunity to correct the mistake. We must bear in mind that this was a mutual mistake, and was one which was very apt to occur. There is ample authority for the proposition that considerations of equity may prevent a forfeiture of a mineral lease where the failure of the lessee to pay the full amount of the delay rentals, or his failure to pay it within the time stipulated, is the result of a mistake on his part, and where the circumstances are such that the mistake is a pardonable one, and particularly where the mistake is a mutual mistake on the part of both the lessor and the lessee. In such cases equity requires that when the lessor learns of the mistake he should promptly inform the lessee of the mistake and give the latter an opportunity to correct it immediately, before he, the lessor, can demand a forfeiture for nonpayment of the rental within the time stipulated. See Monarch Gas Co. v. Roy et al., 81 W.Va. 723, 95 S.E. 789; and Gloyd v. Midwest Refining Co., 10 Cir., 62 F.2d 483. In the latter case the United States Circuit Court of Appeals for the 10th circuit declared:

"Oil lease providing for termination on failure to commence well 'unless' lessee pays rental automatically terminates upon lessee's *intentional* [italics ours] failure to pay stipulated rental within time provided.

" 'Unless' " lease is not automatically terminated by nonpayment of rental within stipulated time, where lessee undertakes in ample time to pay rental through means customarily used, but payment is delayed through accident or *mistake*. [italics ours.]

"Equity will aid enforcement of forfeiture only where to do so conforms with principles of right, justice, and morality."

Our opinion in the present case is in some respects not consistent with some of the pronouncements made in Le Rosen v. North Central Texas Oil Co., Inc., 169 La. 973, 126 So. 442. So far as the two decisions are inconsistent the former henceforth must be considered overruled.

The judgment appealed from is annulled and reversed and the plaintiff's suit is dismissed at her cost, reserving to her the right to claim the alleged shortage in the payment of the delay rentals.

FOURNET, Justice (concurring).

I concur in the majority opinion.

The plaintiff, having accepted from the several assignees of the party to whom she leased her property on September 8, 1943, sums totalling $480, and amount less than that stipulated in the lease, in payment of delay rentals due and payable on or before September 8, 1944, cannot now be heard to say that the amounts thus received and retained by her were not sufficient to continue the lease for the ensuing year. She thereby elected to accept the $480 and her election in this respect had the effect of continuing the lease until its next anniversary date. In other words, she cannot

retain this amount and at the same time claim the lease had terminated. It necessarily follows, therefore, that when the next anniversary date arrived for the payment of these rentals so that the lease might be kept in force for another year, the assignees had reason to assume the amounts previously paid by them to the plaintiff were correct, since she had accepted them without protest the previous year, and it is my opinion that the timely tender for the year 1945 by the defendant here, assignee of a designated portion of the original lease, of the same amount tendered for this same portion the previous year, was sufficient to maintain that portion of the lease for another year and the plaintiff is estopped from claiming its forfeiture.

HAWTHORNE, Justice (dissenting).

In my opinion the proof offered by the plaintiff successfully refutes the contention of the defendant that the maxim "de minimis non curat lex" is applicable to this case.

As I appreciate the pleadings in this case and the argument before this court, the only other defense of the defendant to the cancellation of this lease is that the plaintiff is estopped to demand such cancellation. In my opinion the doctrine of estoppel urged by defendant can have no application to this case.

The specific plea of the defendant is that the plaintiff is estopped to assert that the lease has terminated with respect to the assigned acreage, for the reason that she accepted the delay rental of $300 deposited to her credit and did not complain that it was insufficient until long after the date on which this rental was payable.

The law is well settled in our state that, to effect an estoppel by silence, the party relying upon the doctrine must affirmatively show that the person estopped had full *knowledge* of the facts and of his rights; that he had an intent to mislead or at least a willingness that others should be deceived; that the other party was misled by his attitude. Mere silence itself will not create an estoppel, and, for silence to operate as such, the circumstances must have been such as to create a duty to speak, and there must have been an opportunity to speak. It is essential that the party to be estopped should have had *knowledge* of the facts, and that the adverse party should have been ignorant of the truth and have been misled into doing something that he would not have done but for such silence. See Parker et al. v. Ohio Oil Co., 191 La. 896, 186 So. 604; Harvey v. Richard et al., 200 La. 97, 7 So.2d 674, and authorities therein cited.

The rule with reference to estoppel by acceptance of benefits is that, to create such an estoppel, it is essential that the person against whom the estoppel is claimed should have acted with *knowledge* of the facts and of his rights; that the party claiming the estoppel should have been without knowledge or means of knowledge of the facts

on which he bases his claim of estoppel, and that he must have been misled to his prejudice. See 31 C.J.S., Estoppel, § 190 (b), page 349.

It may be that defendant's plea should be construed as a plea of election or inconsistent positions. According to the text writers, there is some doubt whether the plea of election or inconsistent positions is, strictly speaking, a plea of estoppel, although it is often treated as such in a discussion of estoppel. The rule as to this plea is given by Bigelow on Estoppel (Carter's 6th Ed. 1913), Ch. XX, p. 732, as follows:

"A party cannot either in the course of litigation or in dealings in pais occupy inconsistent positions. Upon that rule election is founded; 'a man shall not be allowed', in the language of the Scotch law, 'to approbate and reprobate.' And where a man has an election between several inconsistent courses of action, he will be confined to that which he first adopts; the election, *if made with knowledge of the facts,* is in itself binding,—it cannot be withdrawn without due consent; it cannot be withdrawn though it has not been acted upon by another by any change of position. * * *" (All italics mine.)

Estoppel is not favored under our jurisprudence, and the burden of proving the facts to establish it rests upon the one relying on the doctrine. In the instant case the defendant has not assumed this burden or made any effort to prove that Mrs. Jones

actually had knowledge of the fact that it had made an insufficient delay rental payment to her. I would feel constrained, however, in the interest of justice to regard the plea of estoppel as valid if the facts and circumstances of this case were such that this knowledge could necessarily be imputed to her.

It is my belief that the concurring opinion of Justice Fournet overlooks the fact that Mrs. Jones could not have elected to accept the $480 as total payments for delay rentals for the period September 8, 1944, to September 8, 1945, unless she had either actual or imputed knowledge of the true facts.

The record discloses that before the first anniversary date of the lease the lessee named therein made two assignments, one being to defendant, and a third assignment was made before the second anniversary date. The lease permitted and authorized such assignments, but the plaintiff was not a party thereto, and did not have knowledge of the area assigned to each, even if she actually knew assignments had been made. It naturally follows that on the first anniversary date she did not know the parties who would pay delay rentals, the area of their respective assignments, and the acreage contained therein. At the first date on which delay rentals were payable, she received only $480 from all parties paying delay rentals under the lease instead of the $518.82 stipulated; but even this fact did not inform her that the de-

fendant was paying an insufficient amount for the surface area contained in its assignment. This is undoubtedly true for the reason that the deposit slip which the bank sent to her showing the deposit made by defendant did not contain any description of the property covered by defendant's assignment; but, even if it had, I have serious doubt that it was her duty to do what the defendant had chosen not to do—that is, to calculate the acreage with certainty—and to inform defendant of its error.

It is entirely possible that, in a lease permitting assignments such as this, the original lessee or one or more of his assignees may have elected not to pay the delay rentals, and in this event the amount deposited to plaintiff's credit as delay rentals by those assignees desiring to maintain the lease as to their respective assigned surface areas would necessarily be less than the amount of delay rental named in the lease. The mere fact, therefore, that only $480.00 was deposited to plaintiff's credit did not impose upon her the duty of checking the records to ascertain what assignments had been made, which assignees had paid their rentals, whether these rentals were sufficient, or whether the original lessee or any of its assignees had elected not to pay the delay rental and drop the lease.

The record does not affirmatively show at what exact date Mrs. Jones, the plaintiff, became aware that defendant had paid an incorrect amount of delay rental, and under the circumstances of this case I cannot say that such knowledge was necessarily imputed to her at a date prior to her demand for a release contained in her letter of September 10, 1945.

Although Mrs. Jones drew against the amount of the first rental payment deposited in her checking account, defendant has not shown or proved to my satisfaction that plaintiff had knowledge when she made such withdrawals that an incorrect amount had been paid. In view of the surrounding circumstances as set forth hereinabove, I have concluded that she had no knowledge of defendant's error.

My conviction that this knowledge cannot be imputed to the plaintiff is strengthened by the statement in defendant's brief that "Mrs. Jones accepted said rentals doubtless believing at the time that she had been paid the correct amount of rentals."

On the argument of this case the majority of this court was apparently impressed by the fact that the plaintiff failed to tender to defendant the amount of the first delay rental payment. The defendant does not complain of this fact, and Mrs. Jones herself does not contend that she is rightfully entitled to this amount. As to the second deposit of $300, Mrs. Jones informed defendant by letter that this deposit made by it was still in the bank, and that she had not accepted or used it, and did not intend to accept or use it.

Under these facts and circumstances, since Mrs. Jones acted in good faith and *without knowledge* of defendant's error in payment, none of the rules relative to estoppel as set out hereinabove is applicable to this case, and in my opinion defendant's plea is without merit.

Defendant relies strongly on a recent case from another jurisdiction to sustain the plea of estoppel in the instant case. Humble Oil & Refining Co. et al. v. Harrison, Tex.Sup., 1947, 205 S.W.2d 355. Without expressing an opinion as to whether the doctrine of equitable estoppel was properly applied in that case, I conclude that the facts and circumstances of that case distinguished it completely from this one. In that case a grantee under an ambiguous mineral deed to which he was a party was paid an insufficient amount of delay rental by a lessee which was not a party to the mineral deed, under leases covering the land described in the deed. The court held that the mineral owner was estopped to assert that the leases had expired as to his interest because he was silent after he *knew* that the lessee had misconstrued the deed, and failed to notify the lessee of the proper construction. There the person against whom the estoppel was urged had the advantage of knowing what the one urging the estoppel could not know—that is, what was intended by the ambiguous mineral deed. The defendant in the instant case, Southern Natural Gas Company, being a party to the assignment and familiar with the description of the property contained therein, certainly had means and ways of ascertaining the surface area of its assignment and computing the correct rental payments, and it was in a better position than plaintiff to make this calculation. That case can be distinguished on other grounds also, but this distinction effectively disposes of the case as to the question of knowledge of the person estopped.

In my opinion the error of the majority has been induced by a lack of appreciation of the difference between the "drill or pay" type lease and the "unless" type lease. This is demonstrated by the fact that the rule applicable to the forfeiture of the "drill or pay" type lease was applied in this case to an "unless" type lease, and that a case which obviously involved a "drill or pay" type lease, Monarch Gas Co. v. Roy, 81 W.Va. 723, 95 S.E. 789, has been cited in support of that rule.

It will be observed that the lease in the instant case is of the type or kind known as the *"unless"* lease, as distinguished from the *"drill or pay"* type. Under an "unless" lease, the lessee is under no duty either to drill or to pay delay rentals; if he either pays or drills, the lease remains in effect, but, if he does neither, it ipso facto terminates at the time of default. It will be observed also that the forfeiture clause in the "unless" lease is for the benefit of, and exercisable by, the lessee or his assigns alone.

The difference in these types of leases has been clearly set out by Summers, thus:

"Sec. 452. When the 'unless' drilling clause is used, the lessee does not covenant to drill or pay. The clause relative to the drilling of wells within a stated time, or the periodic payment of money, is used, not for the purpose of fixing a duty upon the lessee to drill or pay, but to state a limitation upon which the lease terminates if these acts are not performed. Consequently, if the lessee fails to drill within the stipulated time, the lessor cannot recover in an action for rent, or recover in an action for damages for failure to drill, for the obvious reason that there is no duty upon which to found such actions.

"Where the 'drill or pay' clause is used, the courts uniformly hold that the interest of the lessee is subject to be defeated by breach of conditions subsequent; that is, the failure of the lessee to drill or pay within the time or times stipulated in the lease. The power to forfeit the lease is for the benefit of and exercisable by the lessor or his assigns only. Before the lease is terminated by this power there must be a declaration of forfeitures by the lessor and a perfection thereof by re-entry, action, or other operative act. But where the 'unless' drilling clause is used a failure of the lessee to drill or pay a stipulated sum of money ipso facto terminates the lease without the necessity of re-entry, action, or their equivalents by the lessor . * * *"

2 Summers, Oil and Gas, Perm.Ed., Section 452, pp. 494–497.·

The power to forfeit the lease at any of its anniversary dates by failure to pay the delay rentals according to the provision of the lease being exclusively in the lessee or his assigns, it naturally follows that in the instant case, upon failure to drill, for lessee or his assigns to continue the lease in full force and effect beyond each anniversary date, it was their duty and plain obligation to pay the delay rentals as provided therein. The lease in this case plainly stated that, in the event of an assignment as to any segregated portion of the property described therein, the rental payments thereunder should be apportionable as between the several leasehold owners ratably according to the surface area of each. This being so, in order to keep the lease in force by the payment of delay rentals, it was the duty of the assignee, defendant herein, to ascertain the surface area of the property described in its assignment and pay rentals in accordance therewith. Upon its failure to pay the proper rental in accordance with the terms of the lease, the lease as to the assigned area lapsed and expired ipso facto.

By its failure to observe the difference in the "drill or pay" type lease and the "unless" type lease, the court has failed to recognize that the rule that equity abhors a forfeiture is not applicable in this case. Counsel for defendant urged in oral

argument and in brief that forfeiture of a contract or of a party's rights under a contract is one of the harshest civil remedies known to the law and generally is not favored by the courts, and they invoked the court to apply that rule in the instant case. That this rule could have no application here is correctly pointed out by Summers:

"* * * It is no doubt true that, where an 'unless' lease has terminated for the failure of the lessee to drill test wells or pay delay rentals within time or times stipulated, the lessor has a right to have the cloud thereof removed from his title. Many actions for this purpose are brought by lessors, and *some courts, either through failure to carry through the well-recognized distinction between the 'or' and the 'unless' provision, or through negligent habits in the use of terms, speak of these actions as the enforcement of forfeitures, and view them with the same grave concern that they do forfeitures for breach of conditions subsequent.* In some instances, however, courts have held that such actions are not really enforcement of forfeitures and are not affected by the rule that equity abhors a forfeiture.

"Regardless of the terminology used by the courts in reference to the termination of the 'unless' lease for failure of the lessee to drill or pay rentals, *suits for cancellation of such leases after their termination for such failures are, in the better reasoned cases, decided upon principles of law and equity differnet from those involved in the enforcement of forfeitures of the 'drill or pay'* lease. * * *" 2 Summers, op. cit. supra, Section 452, p. 499.

The distinction in these types of leases has been correctly recognized by the Court of Civil Appeals of Texas in the case of Ford v. Cochran et al., Tex.Civ.App., 1920, 223 S.W. 1041, 1042, which involved an "unless" type lease:

"By another assignment [of error] it is insisted that as the rental was tendered on March 7th, only six days after it was due, and prior to such tender plaintiff had not been notified by the lessors of their claim of forfeiture, the court erred in rendering a judgment of forfeiture. In other words, as we interpret the assignment, it is to the effect that time was not of the essence of the contract, and that until the lessors notified the plaintiff of their claim of forfeiture they had no right in equity to claim the same by reason of the short delay in tendering the stipulated rental. Under the terms of the lease, the drilling of a well and the payment of the rental was optional with the plaintiff as the assignee of the original lessee, and he was not bound to do either, and it is a familiar rule that time is of the essence of an optional contract. * * * *Briefly stated, this suit is not in the true sense a suit in equity to declare a forfeiture, but is an action seeking a decree declaring an optional lease terminated for nonperformance of its express conditions upon which its continuation de-*

*pended, and therefore the familiar general rule that a court of equity will not enforce a forfeiture, but will often lend its aid to prevent one, has no application. * * *"*

The case cited in the majority opinion, that is, Gloyd v. Midwest Refining Co., 10 Cir., 1933, 62 F.2d 483, to substantiate the decision on the ground that the failure of the condition of the lease was due to a "pardonable" mistake on the part of the defendant, in my opinion, is not authority for the decision in the instant case. In that case the court made it clear that the failure of the condition was due to an accident or mistake resulting from causes over which the transferee of the original lessee had no control. This transferee had placed the rental payment in the mail in time to reach the transferee of the original lessor prior to the rental date, but the payment was lost in the mail. No facts similar to those exist in the instant case. Here the mistake was not one over which the assignee had no control. It could have ascertained that its assigned area contained more than 300 acres. In fact, it could have ascertained that the original lease contained oversize sections merely by examining the description of the property contained in the lease and comparing that with the number of acres recited as being contained therein, and thus have been made aware that its assigned area would in all probability also contain oversize sections. The "pardonable" mistake in the instant case is therefore not a mistake over which

the assignee had no control as in the Gloyd case.

Nor was the mistake in this case a "mutual" one, for it is not shown by the record that Mrs. Jones "knew that the party making the payment believed that the amount was sufficient, and had good reason to believe it was sufficient." It was impossible for her to know that the party making the payment had good reason to believe it was sufficient, for the record shows that Mrs. Jones was not even informed prior to the date of the first rental payment—and the date on which in my opinion the lease ipso facto terminated—what portion of the lease Southern Natural Gas Company was attempting to make payments for.

Regardless of this, however, in at least one case a different view has been taken from the view in the Gloyd case. In Appling et al. v. Morrison, Tex.Civ.App., 1921, 227 S.W. 708, 709, involving an "unless" type lease, the rental payment due on July 6, 1919, was mailed on July 3 and in due course should have reached the depository named in the lease on or before the rental date, but as a matter of fact the payment did not reach the depository until July 8. The assignees of the lessee in that case contended:

"They having remitted the money through the mails in ample time to have reached said depository on or before July 6, 1919, and through no fault of theirs the remittance is delayed en route, but reached said depository a short time after the 6th, they

are not guilty of laches and are entitled to the equitable relief invoked."

The court rejected this contention, saying:

"Courts of equity do not favor forfeitures, and will usually relieve against them; *but this is in no wise a forfeiture.* Appellants have not contracted to dig a well, nor to pay rentals. They simply had the privilege so to do, and upon failure to drill within the year, and to pay on or before the time fixed, to lose this privilege; in the words of the trial court:

" 'The court concludes as a matter of law that, said rental not having been paid on or before said due date, said lease is forfeited by force of its own terms.' "

Although we have distinguished the Gloyd case from the instant case, in my opinion the reasoning in the Appling case is sounder than that in the Gloyd case. However, the solution of the problem in those cases cannot be a precedent for the decision in the instant case, because as pointed out hereinabove, the mistake was not brought about by causes beyond the control of the Southern Natural Gas Company.

The effect of this decision, in my opinion, is: First, to wipe out the distinction between the "drill or pay" and the "unless" type leases insofar as the rules of forfeitures as to those leases are concerned; second, to place on the lessor in an "unless" type lease a duty—never contemplated by the parties to the lease—of informing the lessee when an error has been made by the lessee in fulfilling the conditions of the lease, and to require such lessor to give the defaulting lessee an opportunity to correct such error; and, third, to alter completely and rewrite the contract, change the intention of the parties as to the nature of the contract when the equity and justice of the case does not require it; and, further, to impose certain duties on the lessor which she did not assume under the contract, as pointed out by Justice McCALEB in his dissenting opinion.

For these reasons I respectfully dissent.

McCALEB, Justice (dissenting).

The contract herein provides: "If operations for drilling are not commenced * * * on or before one year from this date, the lease shall then terminate * * * unless on or before such anniversary date lessee shall pay or tender to lessor * * *." In my view, the failure of defendant to tender the correct amount of rental works an immediate dissolution of the lease, according to its clear and unambiguous provisions. The majority, however, being unable to sustain defendant's plea of estoppel, has nonetheless refused to enforce the forfeiture provided by the parties by imposing three alleged equitable duties upon the lessor, (1) to ascertain the correct amount of rent payable under the assignment, (2) to notify the defendant that it has not paid the amount due and (3) to

give it an opportunity to repair the breach— obligations which she did not assume under the contract.

For this reason and the views expressed in the separate opinion of Justice HAWTHORNE (in which I concur), I respectfully dissent.