## No. 17,517.

PAUL KUGEL, ET AL. *v.* FRANK W. YOUNG, ET AL.

(291 P. [2d] 695)

Decided November 28, 1955. Rehearing denied January 16, 1956.

530　

Messrs. GORSUCH, KIRGIS, CAMPBELL, WALKER & GROVER, Mr. WILLIAM C. McGEHEE, Mr. E. ORD WELLS, for plaintiffs in error.

Messrs. AKOLT, CAMPBELL, TURNQUIST & SHEPERD, for defendants in error except R. F. Spear.

Mr. JOHN E. BELL, for defendant in error R. F. Spear.

*En Banc.*

MR. JUSTICE CLARK delivered the opinion of the Court.

ACTION was commenced by plaintiffs in error to remove cloud from and quiet title to certain lands situate in the counties of Adams and Washington and, specifically, to have decreed the cancellation of an oil and gas lease in so far as the same had been assigned to and was then held by defendants in error. The plaintiffs Hogsett were and are the owners of the record title to said lands while plaintiffs Kugel, Hartman and Stroh acquired interests therein through purchase contracts and other agreements with the Hogsetts.

In the fall of 1950 the Hogsetts, Kugel and Hartman executed an oil and gas lease, covering a total of 3400 acres of land, to one Chase, said lease bearing date of September 27, 1950. Under the "partial assignment" clause contained in the lease Chase assigned portions thereof to various individuals. That with which we are here concerned was assigned to one Orrin Tucker who, in turn, on August 18, 1952, assigned the same to defendant Young by two separate documents, one describing the lands located in Adams County and the other the lands in Washington County; that in certain of said lands plaintiffs did not own the entire mineral right so that Young by his assignments, while covering 2480 gross acres in Adams County, acquired actually 2160 net mineral acres in said county, and 200 net mineral acres in Washington County out of a gross of 240 acres of land, thus bringing his total actual mineral acres acquired under said assignments to 2360. This is the land involved in this litigation.

Usual complications incident to the problem are made more confusing by the findings, conclusions and judgment of the trial court, which at the very outset fell into error in its determination of the primary question involved. Being in error in determination of the primary issue, it necessarily follows that the findings and conclusions of the trial court are rendered erroneous with respect to many secondary issues. Briefly, the trial court found that the lease involved was not an "unless" lease;

that the plaintiffs by acceptance of the rental payment made September 26, 1952, although short in amount by the sum of $160.00, had waived the right to forfeiture of the lease and were estopped to deny the rights of the lessee thereunder, and that all equities in the case favored the defendants. Judgment was entered in favor of defendants on all issues. While we disagree with the findings and conclusions of the trial court, its judgment must be affirmed (except as to one tract of 160 acres) for the reason that where the result is correct even though the reason be wrong we must affirm.

Plaintiffs set up in their summary of argument as grounds for reversal of the judgment of the trial court, the following:

A. That the lease terminated on September 27, 1952, as to all land involved therein because:

(1) Being an *unless* lease it automatically terminated when the proper amount of money was not paid as rendered;

(2) That it is an *unless* lease;

(3) That no well was commenced in the year preceding September 27, 1952;

(4) That there was no proper tender of delay rental on or before said date;

(5) That where one person is the assignee of separate portions of the lease his responsibility for rental payments is not separate with respect to each tract;

B. There is no proper ground for revival of the lease by equitable intervention because:

(1) The mistake made by defendants does not constitute an equitable mistake;

(2) The conduct of plaintiffs was not improper.

C. A number of findings of the trial court are not supported by the evidence; and

D. The trial court erred in not adjudicating the right of defendant Natural Gas Producers, Inc.

Because of the apparent complications involved we shall forego our usual practice of discussing each point

separately, but shall cover all thereof, together with defendants' counter-contentions, in a general analysis of all issues as we see them.

Other than defendant Spear, who claims to be the owner of an overriding royalty and whose interest would be affected to the extent that any part or portion of the lands claimed by Young and his associates be held to be without the terms of said lease, defendants named in the trial court who are not associated with Young, are not parties to this writ of error.

With respect to all essential matters the facts are quite generally agreed to by stipulation appearing in the record. It is agreed that a well was drilled on said premises in 1951 and completed as a "dry hole." It is further agreed that Young procured his assignment from Tucker under date of August 18, 1952, and that he caused to be remitted to the First National Bank at Fort Morgan, the depository bank named in the lease, by Western Union money order message on September 26, 1952, the sum of $2,000.00 as rental for lands in Adams County and $200.00 for the lands in Washington County. Facts relating to errors in said telegram as to land descriptions, as well as other pertinent issues, will be inserted as we proceed.

In the record before us the primary issue as we view it, is whether the lease involved is of the "unless" type. We answer the question in the affirmative. There is no doubt and, in fact it is conceded, that the basic form of the lease, being a Producer's 88, well known in the industry, is a typical *unless* lease. It contains the usual provisions that:

"If no well be commenced on said land on or before the 27th day of September, 1951, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, * * * the sum of three thousand four hundred dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date. * * *

"Should the first well drilled on the above described land be a dry hole, then and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period which rental has been paid, this lease shall terminate as to both parties, unless * * *" further rental be paid.

A duplicate original of this lease, without any attached rider, was placed of public record in both counties in February of 1951. It is the record title upon which the assignments of Chase to Tucker, Tucker to Young, and subsequent assignments by Young, were based. A photostatic copy thereof appears as Entry No. 11 in abstract of title No. A-8469, prepared by The Adams County Abstract Company as plaintiffs' Exhibit C, to which reference is made in the stipulation of facts between the parties, and by which it is therein agreed that "said photostatic copy of said lease at said entry in the abstract is a true and exact copy of the oil and gas lease entered into by the parties * * *." It is the only document of which the assignees of Chase and Tucker had any knowledge during any of the times hereinabove referred to, and is the instrument pursuant to which defendant Young was bound to pay delay rental, under his assignment, by September 27, 1952, in the protection of his interest. During the course of the hearings before the trial court and as they were nearing an end, there was produced by plaintiffs their duplicate original of said lease to which was appended a rider which for some reason or other had either been removed from the duplicate original of said lease which was recorded or had become detached therefrom prior to its recordation. Here we digress a moment to say that insinuations in the argument, and in the findings of the trial court, indicating that the plaintiffs deliberately detached said rider before the recordation of the lease are without justification, because plaintiffs' duplicate of said lease was not recorded and the duplicate original that was recorded shows on the back thereof that it was to be returned after recordation to

Sunny Valley Oil Company, c/o D. C. Jacobsen, Room 272, Shirley Savoy, Denver.

The rider attached to the duplicate original of said lease produced by plaintiffs, inter alia, provides that:

"The consideration for the signing of this lease is the drilling of a well 5500 feet or to the Dakota Sand or to production of oil or gas in commercial quantities if found at a lessor [lesser] depth. Said well to be drilled within the boundaries of * * *. Drilling operations to begin within 120 days of the signing of this lease by the lessors. In the event that said drilling operations are not commenced within 120 days of the signing of this lease by the lessors, then and in such event such lease shall be null and void and of no further force and effect."

The defendants who had up to the point of presentation of plaintiffs' duplicate original of said lease been defending the case on the assumption that the lease was typically an *unless* lease, immediately changed their position, insisting that the rider converted the lease from an "unless" type to the "or" type, and that it was either a "drill or pay" or "drill or forfeit" lease, without specifying which.

While we have some doubt, in view of the fact that the lease was recorded by the lessee, and since defendants throughout their activity in connection therewith conducted themselves in reliance upon said public record, even to the point of stipulating as a fact that such was the lease actually involved in this case, that they are not now bound by that stipulation. However, plaintiffs seem to have accepted defendants challenge to the form of lease and fully half of the arguments presented in this Court pertain to the question recognized by both sides as basic, that is, whether the contract is an "unless" or an "or" lease. We will treat the matter as the parties have treated it and consider the lease with the rider attached.

█ Applying the oft-repeated general rule of construction that a contract must be construed as a whole

giving effect to each and every part thereof, if possible, we find no apparent inconsistency between the Producers' 88 form and the attached rider, since said rider contains nothing in derogation of the unless provisions of the basic lease. In the case of *Davenport v. Doyle Petroleum Co.*, 187 Okla. 40, 100 P. (2d) 445, although the issue was just the reverse to that presented here, the court was dealing with an *unless* lease to which was attached this rider: "Not withstanding the preceding printed part of this lease, lessee *agrees* within sixty days from date to begin the actual drilling of a test well * * *, and prosecute such drilling * * *." (Emphasis supplied.) The question arose whether the rider changed the form to an "or" instead of an "unless" lease. In its opinion, the supreme court of Oklahoma, after referring to the rule that contracts must be construed as a whole and consideration given to each provision therein contained, said: "We perceive no conflict between the typewritten paragraph and the printed portion of the Producers 88 form lease."

■ In our view the Davenport case presents a much more cogent reason for holding the form of lease to be changed by reason of the attached rider than does the case before us, because in that case the lessee definitely agreed to drill a well—lessee "agrees"—while the rider in this case contains no such contract. It says the consideration is the drilling of a well, that said well is to be drilled; that drilling operations are to begin; that in event that drilling operations are not commenced within 120 days the lease shall be null and void and of no further force or effect. Nowhere does the lessee expressly agree to drill. The lessee does not bind himself to do anything, and if he does nothing the lease becomes void. The rider in effect is within itself an *unless* proviso. *Bowes v. Republic Oil Co.*, (Mont.) 252 Pac. 800. The lease involved in this case definitely falls within the *unless* type and is an *unless* lease.

■ The next question that logically presents itself is, what are the characteristics and effect of an *unless*

lease? An *unless* lease creates an estate or interest in the lessee on limitation, 2 Summers Oil and Gas, Perm. Ed., 498, section 452. It is a covenant running with the land. 3 Summers Oil and Gas, Perm. Ed., 297, et seq., section 553. As true generally respecting oil and gas leases, payment of delay rental in advance is a condition precedent and time is of the essence. *Epperson v. Helborn*, 145 Ark. 566, 225 S.W. 345, 15 A.L.R. 597; *Phillips Petroleum Co. v. Curtis*, 182 F. (2d) 122; *Valentine Oil Co. v. Powers*, 157 Neb. 71, 59 N.W. (2d) 150.

Although there are exceptions, it is now generally recognized in jurisdictions where litigation pertaining to oil and gas leases has been carried on for many years that, where the unless lease is employed and no well has been drilled and no delay rental has been paid in the manner and within the time fixed by the contract, the lease automatically terminates by virtue of the limitation contained within itself. This principle already has been recognized in Colorado. *Hill v. Stanolind Oil & Gas Co.*, 119 Colo. 477, 205 P. (2d) 643.

While appellate courts, through the use of inaccurate terminology, have frequently referred to the termination of an *unless* lease as a "forfeiture," there actually is no element of forfeiture involved. The lessor is not required to do anything, but the lessee's failure to meet the conditions of the contract automatically terminates it. The interest created in the lessee by such a lease does not become forfeited upon failure to comply with its conditions; it simply expires. *Ellison v. Skelly Oil Co.*, 206 Okla. 496, 244 P. (2d) 832; *Guerra v. Chancellor*, (Tex. Civ. App.), 103 S.W. (2d) 775; *Steffes v. Allen*, 295 Mich. 510, 295 N.W. 245; *Phillips Petroleum Co. v. Curtis, supra*. There being no forfeiture involved in an *unless* lease, notice of termination is not necessary even though a provision contained in the lease presumes to require it. *Lewis v. Grininger*, 198 Okla. 419, 179 P. (2d) 463. Delay rental as provided by the lease must be paid in the full amount on or before its due date and to

the proper depository. Any failure to meet these requirements which are in any way or manner attributable to the lessee, his employees, or agencies selected by him and to whom he has delegated the performance of certain duties in his stead, are chargeable to the lessee and do not excuse his failure to strictly comply with said conditions. Intention, good faith, and a mistake on the part of the lessee generally are not considered as material. *Vaughan v. Doss,* 219 Ark. 963, 245 S.W. (2d) 826; *Valentine Oil Co. v. Powers, supra; Phillips Petroleum Co. v. Curtis, Supra; Young v. Jones,* (Tex. Civ. App.) 222 S.W. 691.

In some of the decisions above cited may be found the rule, announced in many other cases, that the general rule of construction applied to contracts is not to be followed in the case of oil and gas leases, but that the same are to be construed in favor of the lessor. The decisions above cited are not intended to be exhaustive on the subject, but are only illustrative of the tendency of the courts in practically all jurisdictions to strictly construe the *unless* lease. There are also decisions that where the failure to meet the conditions of the lease are attributable to the actions of persons other than the lessee and those delegated by him, such as, for example, where the postal department failed to deliver a letter containing the remittance or delivered it to the wrong address, relief may be afforded; as was done in *Gloyd v. Midwest Refining co.,* 62 F. (2d) 483.

The next question to present itself is whether the plaintiffs bring their situation within the positive restrictions and limitations of the *unless* lease. Their contention is that they have done so and that the failure of the defendant Young to pay the full sum of $2360.00 delay rental in 1952 worked a termination of the lease in its entirety. On the other hand, counsel for defendants contend that the payment of $2200.00 on September 26, 1952, by Young, even though $160.00 short, when accepted by the lessors, extended the entire lease for one full

additional year. In the alternative they contend that since the lands in the respective counties were assigned by separate documents the lease became divisible and since the full rental on the 200 mineral acres in Washington County was paid in time, the lease certainly is good as to that land. This is only incidental, but in passing we may say that in this contention they are in error. While as between the different assignees the lease may seem to be divisible, as to the lessors it is indivisible, and they are not obliged to keep track of who acquires interests therein by assignment from parties other than themselves.

That our solution of the legal problems involved may be understood it is necessary that we set forth the facts with regard to the payment of delay rental in September, 1952, and what happened with respect thereto. Young lived in Springfield, Illinois, conducted business there, in Chicago, and many other places. He would appear to be a very energetic individual. For some reason he did not have before him the descriptions of the lands to which he had taken assignment from Tucker, but realized that delay rental must be paid to these plaintiffs on or before September 27, 1952. He had negotiated a loan from Bankers Life and Casualty Company, with which to pay these and other rentals. On the advice of Tucker's Chicago attorney, he called by telephone one Bell, also Tucker's attorney, residing at Brush, Colorado, asking him to furnish the Bankers Life with a description of said lands and the amount of rental due thereon. He arranged with Bankers Life to contact Bell and thereupon transmit the proper rentals to the First National Bank at Fort Morgan. Young himself had to make a business trip to California, which would take him away from the city beyond the end of the rental paying period. It is agreed that the proper rental payable on the Adams County lands would have been $2160.00, and on the Washington County lands $200.00. On September 26, 1952, there was delivered to the bank at Fort Morgan the Western Union

remittance telegram including, among others, $2,000.00 to the credit of plaintiffs Kugel, Hartman, Hogsett and Hogsett, to cover the delay rental on lands therein specifically described as:

"THE EAST ½ AND THE EAST ½ OF THE N W ¼ SECTION 22: ALL OF SECTION 23, THE WEST ½ OF THE WEST ½, SECTION 24; SOUTHWEST ¼ OF THE SECTION 25, ONE-HALF INTEREST IN THE EAST ½ SECTION 25; ONE-HALF INTEREST IN THE NORTH ½ SECTION 26; AND THE SOUTHEAST ½ SECTION 26; AND THE NORTHEAST ¼ OF SECTION 27; ALL IN TOWNSHIP 1 SOUTH, RANGE 47 WEST, ADAMS COUNTY, COLORADO."

$200.00 to the credit of the same parties, the land description reading:

COVERING AN UNDIVIDED 31, TOWNSHIP 1 SOUTH, RANGE 56 WEST, OF THE 6TH PRINCIP. MERIDIAN LOCATED IN WASHINGTON COUNTY, COLORADO.

By the stipulation of facts it is agreed that the land description with respect to the Adams County lands as contained in the telegram delivered to the bank at Fort Morgan, except for slight variation in punctuation, is the same as the description contained in the message as filed with Western Union in Chicago by Bankers Life.

The officer of the Fort Morgan bank who handled the transaction upon receipt of the telegraphic remittance made out two deposit slips in accordance with the telegram, placing $2,000.00 to the credit of the parties therein designated, describing on the deposit slip the Adams County land exactly as set forth in the telegram except that instead of saying "THE SOUTHEAST ½, SECTION 26" he wrote "SE ¼, SECTION 26." It is agreed that the error occurred with respect to lands in Section 26. Although the description of the lands situate in Washington County was also erroneous, no dispute has arisen concerning them since it is recognized there are 200 acres located in said county; and that $200.00 rental was paid.

We need not again refer to the Washington County lands.

If the defendants' contention with respect to the Adams County lands that the whole south half of section 26 was intended to be included rather than only the southeast quarter, then it becomes apparent that the remittance was short $160.00. The lands as described on the deposit slip in the bank at Fort Morgan cover exactly 2,000 acres. An incidental point here arises as to whether the bank at Fort Morgan was justified in interpreting the telegram as it did. We say it was, because there is no other interpretation of the description that was contained in the telegram that can be made and at the same time not increase the total beyond 2,000 acres. In addition, the southeast half of section 26 describes nothing. The word "southeast" being written out takes precedence over the numerical figure $\frac{1}{2}$. The bank's interpretation was entirely proper and is the only one possible to be made under the circumstances. The lands are correctly described on the deposit slip.

Upon receipt of the remittance the bank notified plaintiffs, and also pursuant to previous request notified Bell. The remittance presumably was received by the bank on Friday, Bell came over to the bank the first of the following week, and realizing that there was a misdescription in the transmittal telegram, he suggested that he prepare receipts so that copies thereof might be returned to Bankers Life and to Young. Shortly thereafter separate receipts were prepared by Bell, which the banker testified he signed without reading. Bell, in preparing the receipt to cover the Adams County lands, omitted therefrom the West Half of the West Half of Section 24, which was included in the telegram, and substituted therefor the southwest quarter of section 26. On behalf of defendants it is contended throughout this proceeding that these, as the official receipts of the depository bank, are binding on all parties. With this we cannot agree. In the first place Bell was entirely without authority to omit from the form of the receipt tendered by him any

of the lands specifically described in the telegram or to make substitution of other lands for those omitted. In fact Young now stoutly contends that Bell had no authority to represent him whatsoever. Secondly, assuming that Bell may have had authority, the depository bank had no right to change or modify the telegraphic instruction. The receipts are worthless and irrelevant.

We come now to consider what the plaintiffs did. In this connection it is well to bear in mind that the plaintiffs are farmers, not oil men, and that in 1952 they were unfamiliar with leases, documents and practices pertaining to the petroleum industry. Mr. Hogsett went to the Fort Morgan bank on September 27th, was handed copies of the deposit slips, and was shown the telegram, a copy of which was furnished him the next day. He later was given a copy of the land descriptions as contained in the receipts prepared by Bell. This simply served to further complicate matters so far as plaintiffs were concerned since the land description in the Adams County receipt did not correspond with that in the telegram. They frankly admit that they were at first disappointed at not receiving more money, and that they had actually expected $3400.00. They concluded that the difference arose because of there having been various assignments under the original lease. The assignment of Chase to Tucker was of record but they did not know what portion of the lands covered thereby had been assigned from Tucker to Young, which assignments did not appear of record for some weeks thereafter. They also were concerned about the manner of division of the money among themselves, but succeeded in computing that without difficulty. Still realizing that something was amiss and not knowing exactly what it was, and as Hogsett testified, under the belief that it probably would adjust itself later, they went to the Fort Morgan bank on October 20th, presented a check on the joint account for the full $2200.00, divided the money among themselves pursuant to their agreement; all but one of them taking checks

which were deposited in other banks to their individual accounts and the one not taking a check receiving his share in cash. Over a month later and on November 24th they undertook to revoke what they had done by attempting to serve notice upon Young, whose address they did not know, by having said notice delivered to Bell to the effect that the lease had terminated, demanding a formal surrender thereof and attaching thereto Hogsett's check for $2200.00 as a return of the money paid to the Fort Morgan bank on September 26th. The major question presenting itself therefore is, what was the effect, if any, of the acceptance and use by plaintiffs of the $2200.00?

Notwithstanding the general adherence of the courts to the rule frequently announced that payment of the delay rental in the amount and manner stipulated in an *unless* lease is a condition precedent; that time is of the essence; that termination occurs by limitation and not by forfeiture; that equitable defenses are not available; nor will mistake, good faith, or honest intention excuse default; that the defenses of waiver and estoppel may not be employed; nevertheless, in practically all jurisdictions where development of petroleum resources breed litigation, we find that in exceptional situations the courts have found ways to grant relief by resort to some rule of equity in what may seem to them as hardship cases. These decisions lack uniformity and one is sometimes astonished to find that in jurisdictions where ordinarily the *unless* type lease is strictly construed there are decisions wherein waiver, estoppel or some other equitable doctrine is held to apply.

The case before us presents an unusual situation in that the lessors accepted and applied to their personal use the tendered rental covering lands specifically described. In every decision cited in the briefs, or of which we have any knowledge, from *Young v. Jones, supra,* on down to date, where the lease was declared terminated either because of the shortage in payment of the rental

due, or of its late remittance, the lessor has refused to accept the money. We are aware of no instance where the lessor kept the money and later by offering to return it succeeded in having the lease declared judicially cancelled. In two Texas decisions where rentals had been accepted under *unless* leases after their due dates it was held that lessors were *estopped* to claim that the lease had terminated. *Mitchell v. Simms,* (Tex. Civ. App.) 63 S.W. (2d) 371; *McCoy v. Texon Royalty Co.,* (Tex. Civ. App.) 124 S.W. (2d) 877. Also, where the lessee innocently misconstrued an ambiguous conveyance equitable relief was allowed and the holder of the interest held to be *estopped. Humble Oil and Refining Co. v. Harrison,* 146 Tex. 216, 205 S.W. (2d) 355. In Louisiana where the lessor demanded surrender because of insufficient payment and the facts were that the tracts were irregular and the exact acreage not readily ascertainable and the lessor had accepted the same payment in the prior year, she was held to be *estopped. Jones v. Southern Natural Gas Co.,* 213 La. 1051, 36 S. (2d) 34. Two cases in Arkansas hold that estoppel applies where rental paid late was accepted. *Bray v. Woodley,* 162 Ark. 186, 258 S.W. 119; *Cordell v. Enis,* 162 Ark. 41, 257 S.W. 375. In Montana, which has been quite strict in construction of the *unless* lease, it was held that the acceptance of delay rental paid .late constituted a waiver on the part of the lessor. *Nadeau v. Texas Co.,* 104 Mont. 558, 69 P. (2d) 586. Again the citations given are not intended to be exhaustive of the subject.

 Regardless of the persuasiveness of some of the decisions from other jurisdictions wherein equitable principles have been employed as a measure of relief from the severe limitations of an *unless* lease, we prefer to be numbered among those who adhere to the doctrine of strict construction of such a lease. However, under the facts and circumstances peculiar to this case our course is charted by adopting as our own the following quotation from the supreme court of Texas: "But it does

not become necessary in this case to resort to equitable considerations and reasoning * * *." *Hamilton v. Baker,* 147 Tex. 240, 214 S.W. (2d) 460. The Texas case was concerned with the error of a bank which wrongfully had refused payment on a rental check tendered in time. The facts, it is true, are different from the facts in this case but the same rule applies. Here we are confronted with the effect of a definite offer to pay the rentals within time on a certain acreage specifically described and a tender of the correct amount to cover that acreage. This offer plaintiffs need not have accepted; but by taking the money, distributing it amongst themselves, and applying it to their respective individual accounts they did accept. It, as we have shown, is clear that under the *unless* type of lease the burden of preventing its termination lies wholly upon the lessee; the lessor is not required to do anything and had the lessors in this instance done nothing, the lease would have terminated in toto. Not content to remain inactive, they intervened; they did something; they took the $2200.00 from the bank and applied it to their separate accounts. We believe there can be no question but that the voluntary acceptance of the stipulated per acre rental on a described area less than the whole covered by the lease works to continue the lease on the lands described and a surrender of that portion omitted. It is not a revivication of a dead contract because as to the lands described the lease did not expire. Nor can it be said that this is a judicial modification of a contract between the parties, because any modification actually made in the terms of the lease was made by the acts of the parties themselves in the offer and acceptance of the rentals.

Should it be contended on behalf of plaintiff that the rule herein announced would not apply to them because they did not know the area covered by the Young assignment and had no intention of accepting any delay rental payment on any less than the whole of the tract, the answer to that simply is that while they need not have ac-

cepted the money, they did. Had they been uncertain they should have rejected the offer or at the very least refused to accept the money until they had made certain.

On the other hand it is contended on behalf of Young and his associates and assigns that he used reasonable diligence in trying to learn the correct description of lands included in his assignments from Tucker; that he exercised the utmost good faith and that in making the remittance of $2200.00 on time had no intention other than payment of the delay rental on the entire acreage covered by the assignment from Tucker. By no stretch of imagination can it be claimed, however, that his remittance covered in excess of 2200 acres, the exact area of the lands described in the transmittal telegram. It, therefore, becomes readily and irresistably apparent that no tender of delay rental was made to cover the southwest quarter of section 26. The burden to protect the lease is upon the lessee and his assigns. The remittance was calculated and transmitted through agencies selected by Young. Good faith and intention are not to be considered. *Ellison v. Skelly Oil Co., supra.* He did not pay the rental on the southwest quarter of section 26 and the lease thereon terminated automatically.

For the reasons aforesaid the case is remanded to the trial court with instructions to vacate the judgment and decree heretofore entered and to enter a judgment and decree quieting the title of plaintiffs in and to the southwest one-quarter of section 26, Township 1 South, Range 57 West of the Sixth Principal Meridian; declaring said lease valid as to the remainder of the plaintiffs' lands covered by assignments from Tucker to Young and defining the interests of other involved defendants in conformity with the views herein expressed.

## ON PETITION FOR REHEARING.

Mr. Justice Clark:

Petition for rehearing filed on behalf of plaintiffs in

error is directed to that part of the opinion wherein we held that the timely tender of $2,000.00 covering the rental on 2,000 acres of land in Adams County, specifically described, and the subsequent voluntary withdrawal and division of that money by lessors must be given effect as being in the nature of an offer and acceptance retaining life in the lease to that extent.

The petition has given us cause to pause and devote further study to the point, but after serious consideration we are impelled to the conviction that we must adhere to our opinion as written. While possibly, were this a matter of a contract arising in the first instance strictly upon the theory of offer and acceptance, some essential elements might fairly be said to be lacking, yet where we have under consideration an already existing contract partially performed, and under the facts and circumstances peculiarly applicable to this case, we cannot escape the conclusion that the picture revealed, if not technically an offer and acceptance, is so closely in the nature thereof that the result is the same.

The depository bank did not modify the land description contained in the transmittal telegram—it only construed an apparent error. The lessors adopted that proper land description. The exact subdivisions and interests covered by the $2,000.00 were never in doubt in their minds. They need not have taken the money if uncertain that it was insufficient to cover all the land held under that particular assignment, but they did take it. They are bound by what they did, as is also Young and his assigns, notwithstanding claimed mistake on his part also.