Preston J. MILLER

v.

R. E. KELLERMAN, Ted Weiner, and Nichols & Company, Inc. (of Massachusetts).

Civ. A. No. 8645.

United States District Court
W. D. Louisiana,
Lafayette Division.

March 19, 1964.

James Domengeaux, Lafayette, La., for plaintiff.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants.

HUNTER, District Judge.

Miller seeks cancellation of an oil and gas lease on a 78-acre tract of land in Vermilion Parish, Louisiana. The lease is a well written and cleverly worded contract which was entered into between parties, experienced and well versed in the field of oil and gas. The fact is that with only 78 acres of land included in the lease, the terms of the lease concerning development and spacing were just not suitable for operation in a gas area.

The lease, executed on May 5, 1956, had a primary term of three (3) years. A bonus payment of $500 maintained the lease for the first year to May 5, 1957. The lease also contains the familiar "unless clause" in paragraph 3 which calls for a delay rental of $3,900 on or before May 5, 1957, and a delay rental of $7,-800 on or before May 5, 1958.

Plaintiff pegs his case for cancellation on four (4) basic contentions:

(1) Defendants' failure to pay the full amount of delay rental due on May 5, 1958.

(2) Defendants breached the express obligations to drill on plaintiff's lease as required by Paragraphs 6 and 7 thereof.

(3) Defendants pooled plaintiff's portions of plaintiff's lease with other lands in violation of Paragraph 10 of the lease.

(4) Defendants failed to pay plaintiff in lieu of royalty from the Bernard and O'Neil-Hebert wells and refused to market production from the S2 and S3 sands in violation of Paragraph 8(B) of the lease.

The case was tried to the Court without a jury. The facts are not in serious dispute and for the most part have been stipulated. They are:

1. Plaintiff is a citizen and resident of the State of Louisiana.

2. Defendants are residents of and citizens of States other than Louisiana.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.

4. Preston J. Miller granted an oil, gas and mineral lease to Ted Weiner, dated May 5, 1956 (Df. Exh. A, annexed hereto), recorded in Conveyance Book 316, folio 254, under Entry No. 130318, of the records of Vermilion Parish, Louisiana, covering the following described lands:

That certain tract of land containing seventy-eight (78) acres, more or less described as being the South-

east Quarter of the Northeast Quarter and the Northeast Quarter of the Southeast Quarter of Section One (1), Township Fourteen (14) South, Range Two (2) east, LESS a strip being one-quarter (¼) acre wide off of the entire Western side of these tracts, approximately three and one-half (3½) acres,

said lease sometimes referred to herein as the Miller Lease. Said lease provided for a primary term of three (3) years ending May 5, 1959. The Miller lease was assigned by Ted Weiner to Nichols & Company, Inc., a Massachusetts corporation, by instrument dated January 15, 1958, recorded in Conveyance Book 352, folio 574, under Entry No. 137564, of the records of Vermilion Parish, Louisiana. Nichols & Company, Inc. assigned the Miller Lease to R. E. Kellerman by instrument dated December 16, 1958, recorded in Conveyance Book 378, folio 135, under Entry No. 142257, of the records of Vermilion Parish, Louisiana.

5. The Ohio Oil Company-Walter Durke No. 1 and No. 1-D Well was spudded on March 4, 1957. This well is located in the SE/4 of Section 35, Township 13 South, Range 2 East, approximately 2440 feet north of the northern boundary of the Miller Lease property, as shown on the plat marked Pl. Exh. 2, annexed hereto, and on the plat attached to the affidavit of Karl Hagemeier marked Df. Exh. C, annexed hereto. No production was obtained from this well prior to May 25, 1958 as to the C-6 Sand and May 30, 1958 as to the S-D 1 Sand.

6. Louisiana Department of Conservation Order 367, dated March 18, 1957, effective March 13, 1957, pertaining to the Cristellaria-6 Sand prescribed certain drilling units and force pooled the North ½ of the Miller Lease in a unit on which the Ohio Oil Company-Walter Durke Well (referred to in Paragraph 5 above) was located. The same order also force pooled the South ½ of the Miller Lease with other property into a drilling unit for the Cristellaria-6 Sand (Pl. Exh. 2 and Df. Exh. D-1, annexed hereto). This order was subsequently revised. No wells were drilled prior to revision of Order 367 other than the Durke Well.

7. The Ohio Oil Company-Walter Durke Well was dually completed as a gas well on April 12, 1957, in the Siphonina-Davisi 1 Sand (Well No. 1) and in the Cristellaria-6 Sand (Well No. 1-D) (Df. Exh. C and Df. Exh. I-1 annexed hereto), which was known to defendants at that time. The Siphonina-Davisi 1 Sand, the lower sand, was not unitized at that time but was subsequently unitized as stated in Paragraph 10 hereof. The Durke Well was not produced until May 25, 1958.

8. Annual delay rentals in the sum of $3,900.00 were paid to Lessor under the Miller lease on April 20, 1957, for the period May 5, 1957 to May 5, 1958, and the check was cashed by Lessor (Df. Exh. 8, attached hereto).

9. Conservation Order 367-1, dated October 25, 1957, denied Superior Oil Company's application for revision of the Cristellaria-6 Sand Units. (See Df. Exh. D-2, attached hereto).

10. Conservation Order No. 367-A, dated November 6, 1957, effective November 1, 1957, prescribed drilling units for the Siphonina-Davisi 1 Sand and force pooled the Miller Lease into two units as to this sand (Df. Exh. D-3, annexed hereto). This order was subsequently revised.

11. The boundaries for the units established by Conservation Order No. 367-A for the Siphonina-Davisi 1 Sand were identical to the boundaries of the units previously established by Conservation Order No. 367 for the Cristellaria-6 Sand as shown on Pl. Exh. 2, Pl. Exh. 3, Pl. Exh. 4, Pl. Exh. 5, Pl. Exh. 6, Df. Exh. D-1 and Df. Exh. D-3, annexed hereto. These units were subsequently revised.

12. Annual delay rentals in the sum of $3,900.00 were paid to Lessor under the Miller lease on April 23, 1958 for the period May 5, 1958 to May 5, 1959 and the check was cashed by Lessor (Df. Exh. B, annexed hereto).

By letter dated March 28, 1963, plaintiff, through his attorney, transmitted his check to defendants in the amount of $3,900.00, representing the return of the delay rental for the period May 5, 1958 to May 5, 1959, with the explanation that the rental due was $7,800.00 instead of $3,900.00 (Pl. Exh. 26).

By letter dated April 3, 1963, Texas Crude Oil Company, acting on behalf of defendants through defendants' attorneys, returned plaintiff's aforesaid check in the amount of $3,900.00 to plaintiff and, in addition, delivered to plaintiff an additional check for $3,900.00 as an additional rental payment for the period May 5, 1958 to May 5, 1959, making a total of $7,800.00, with the explanation that defendant did not believe any additional rental was due and with reservation of the right to have a judicial determination as to the proper amount of delay rental due for the period May 5, 1958 to May 5, 1959. (Pl. Exh. 27).

13. Subsequent to April 3, 1963 it has been ascertained that the Durke well was not placed on production until May 25, 1958 and it is now conceded that the correct rental due on May 5, 1958 was $7,800.00 as contended by plaintiff.

14. Conservation Order 367-3, dated June 3, 1958, effective May 28, 1958, pertaining to the Cristellaria-6 Sand, revised the units adopted by Conservation Order 367 and force pooled the Miller Lease into two units (Df. Exh. D-5). The North ½ of the Miller Lease was included in a 322.29-acre unit on which was located The Ohio-Durke Well described in Paragraph IV hereinabove. The South ½ of the Miller Lease was included in another 322.48-acre unit by the same order. This order was subsequently revised. (Plat Pl. Exh. 4). No well was drilled on the latter unit which included the South ½ of the Miller Lease until the Bernard Well was drilled.

15. Conservation Order 367-A-1, dated June 3, 1958, effective June 1, 1958, pertaining to the Siphonina-Davisi 1 Sand, revised the units established by Conservation Order 367-A and force pooled the Miller Lease into two units.

The units created were identical to those for the Cristellaria-6 Sand (upper sand) described in Paragraph 14 above (Pl. Exh. 4, Df. Exh. D-6). This order was subsequently revised.

16. The Walter Durke No. 1-D Well was initially granted an allowable of 2000 MCF daily from May 25, 1958 through the months of May and June 1958 by gas clearance dated June 5, 1958 issued by the Commissioner of Conservation (Pl. Exh. 16).

17. The Walter Durke No. 1 Well was initially granted an allowable of 2000 MCF daily from May 30, 1958 through the months of May and June 1958 by gas clearance dated June 5, 1958 issued by the Commissioner of Conservation (Pl. Exh. 17).

18. The Superior Oil Company-Bernard Unit Well No. 1 and No. 1-D was spudded on July 19, 1958 and was dually completed on September 4, 1958 in the Siphonina-Davisi 1 Sand (Well No. 1) and in the Cristellaria-6 Sand, the upper sand (Well No. 1-D). This well also encountered deeper sands known as the Siphonina-Davisi 2 Sand and the Siphonina-Davisi 3 Sand, which facts were known to defendants at that time.

The Superior-Bernard Unit Well is located in the NW/4 of the SE/4 of Section 1, Township 14 South, Range 2 East, at a point approximately 390 feet west of the Miller Lease on the 322.48-acre units previously established for these two sands, which units included the South ½ of the Miller Lease and had identical boundaries. As of September 4, 1958, all the property covered by the Miller Lease was included within productive units for the Cristellaria-6 Sand and the Siphonina-Davisi 1 Sand (Df. Exh. C, Df. Exh. D-1, Df. Exh. D-3, Df. Exh. I-2 and Pl. Exh. 4, annexed hereto).

19. The Superior Oil Company-Bernard Unit Well was placed on production commencing November, 1958 as the unit well for the Cristellaria-6 Sand and the Siphonina-Davisi 1 Sand, pursuant to Conservation Order No. 367-3, and Conservation Order No. 367-A-1. (Df. Exh. D-5 and Df. Exh. D-6, annexed hereto).

20. The Ohio Oil Company-Walter Durke Well was placed on production commencing May 25, 1958 as the unit well for the Cristellaria-6 Sand and the Siphonina-Davisi 1 Sand, pursuant to Conservation Order No. 367-3 and Conservation Order No. 367-A-1 (Df. Exh. D-5 and Df. Exh. D-6, annexed hereto).

21. The Trice Production Company-Nunez, et al. Unit No. 1 Well was spudded on September 27, 1959 and encountered the Cristellaria-6 Sand, the Siphonina-Davisi 1 Sand and the Siphonina-Davisi 2 Sand. This well blew out, caught fire and was plugged and abandoned.

22. The Trice Production Company-Nunez, et al. Unit Relief Well No. 1-A was spudded on November 30, 1959 to the east of the Unit No. 1 Well referred to in Paragraph 21 and to the east of the Miller Lease (Df. Exh. C, Pl. Exh. 5 and Pl. Exh. 6). This well was located to the east of the Miller Lease in Section 65, Township 14 South, Range 3 East, and to the east of the original Trice-Nunez Unit No. 1 Well. This well encountered the Cristellaria-6 Sand, the Siphonina-Davisi 1 Sand, the Siphonina-Davisi 2 Sand, the Siphonina-Davisi 3 Sand and the Siphonina-Davisi 4 Sand (Df. Exh. C, Df. Exh. E, Df. Exh. I-3, Pl. Exh. 5 and Pl. Exh. 9, annexed hereto), which facts were known to defendants.

23. Conservation Order 367-B, dated January 29, 1960, effective same date, established a drilling and producing unit around the Trice Production Company-Nunez et al. Unit 1-A Relief Well for the Nunez (12,304-foot) sand, Theall Field, defined in the Order as "that sand occurring in the Trice Production Company-Nunez, et al. Unit No. 1 Well in Section 65, Township 14 South, Range 3 East, Vermilion Parish, Louisiana, at the approximate depth of 12,304 feet, and which sand is productive of gas and gas condensate" (Df. Exh. D-8). The Miller Lease is not included in any drilling unit as to the Nunez Sand under this order. It is conceded that this well is within spacing unit distance of the Miller Lease.

24. The Trice Production Company-Nunez et al. Unit No. 1-A Relief Well was completed as a gas well on February 25, 1960, in the Siphonina-Davisi 1 Sand, as shown by the certified copy of Trice Production Company's letter to the Department of Conservation dated February 29, 1960, requesting a gas allowable for the Trice Production Company's No. 1-A Nunez et al. Unit Well (Df. Exh. I-3(5)), by the certified copy of the "Well History and Work Résumé Report") filed by Trice Production Company with the Department of Conservation (Df. Exh. I-3(6, 7)), and by the certified copy of the Department of Conservation Authority to Produce dated March 4, 1960 (Df. Exh. I-3(8)).

The western boundary of the unit around the Trice Production Company-Nunez Unit 1-A Relief Well, which was completed in the Siphonina-Davisi 1 Sand, coincides with the eastern boundary of the Miller Lease property and with the eastern boundary of the Drilling and Producing Unit around The Ohio Oil Company-Durke Well, completed in the Siphonina-Davisi 1 Sand and the Drilling and Producing Unit around the Superior Oil Company-Bernard Well, also completed in the Siphonina-Davisi 1 Sand. The entire North ½ of the Miller Lease was included in the unit for the Siphonina-Davisi 1 Sand around the Ohio Oil Company-Durke Well and the entire South ½ of the Miller Lease was included in the unit for the Siphonina-Davisi 1 Sand around the Superior Oil Company-Bernard Well (Df. Exh. C, Df. Exh. E, Df. Exh. D-6 and Df. Exh. D-8).

25. The Ohio Oil Company-O'Neil Hebert Well was spudded on November 1, 1960 at a point approximately 800 feet northwest of the Miller Lease in the NW/4 of the NE/4 of Section 1, Township 14 South, Range 2 East. This well was dually completed on January 12, 1961 in the Siphonina-Davisi 3 Sand (Well No. 1) and in the Siphonina-Davisi 2 Sand (Well No. 1-D), (Pl. Exh. 6, Df. Exh. C and Df. Exh. I-4). These sands were not unitized at that time. These facts were known to defendants at that time.

26. On June 12, 1961, plaintiff, P. J. Miller, met with K. F. Hagemeier and with Scott G. Baum and received the letter dated June 13, 1961 from Mr. K. F. Hagemeier (Pf. Exh. 7, annexed hereto).

By letter dated June 21, 1961 from the Ohio Oil Company, plaintiff, P. J. Miller, received a copy of the geological data sheet compiled by the Theall Field Geological and Engineering Committee, together with maps of the four gas reservoirs at Theall Field, Vermilion Parish (Pf. Exh. 8, Pf. Exh. 9, Pf. Exh. 10, Pf. Exh. 11, Pf. Exh. 12, Pf. Exh. 13, annexed hereto).

27. A letter dated November 16, 1961 (Pl. Exh. 25) was sent to the defendants demanding that the lease be released and that a document be executed declaring that the Miller Lease had terminated. This was refused.

28. The instant suit was filed December 28, 1961 in the Fifteenth Judicial District Court in and for the Parish of Vermilion, Louisiana, under Docket No. 22911, and was removed to this Court on January 18, 1962.

29. On January 18, 1962, a hearing was held in Baton Rouge, Louisiana, at which hearing Mr. Burton C. Bowen appeared on behalf of defendants, R. E. Kellerman, Nichols and Company, Inc., and Ted Weiner, at which time the following conversation took place:

"Mr. Commissioner, I am Burton C. Bowen, I represent R. E. Kellerman, Nichols and Company and Ted Weiner, the owners of a seventy-eight-acre lease in Section 1, Township 14 South, Range 2 East.

"I have reviewed the geology of Theall Field and feel that the units as proposed are fair and equitable, and that the existing wells will adequately drain the reservoir. Any additional wells, we feel, will be unnecessary and wasteful."

Mr. Domengeaux: "May I ask you a question?"

Mr. Bowen: "Yes."

Mr. Domengeaux: "Are you acquainted with the fact that there is presently a lawsuit to set aside the leases of the people that you represent?"

Mr. Bowen: "Yes, Sir."

Mr. Domengeaux: "Thank you."

30. Neither R. E. Kellerman nor any other defendant nor anyone acting in their behalf participated in any way in the drilling of The Ohio Oil Company-O'Neil Hebert Well in the NW/4 of the NE/4 of Section 1, Township 14 South, Range 2 East.

31. Conservation Order 367-4, dated March 19, 1962, effective April 1, 1962, created a fieldwide unit for the Cristellaria-6 Sand and force pooled 71.5359 acres of the Miller Lease. (See Tract 35 on Df. Exh. D-9, annexed hereto). It is stipulated that the location of the sand is as shown in said order.

32. Conservation Order 367-A-3, dated March 19, 1962, effective April 1, 1962, created a fieldwide unit for the Siphonina-Davisi 1 Sand and force pooled 75.3623 acres of the Miller Lease. (See Tract 33 on Df. Exh. D-10, annexed hereto). All of the Miller Lease is included within this unit. It is stipulated that the location of the sand is as shown in said order.

33. Conservation Order 367-C, dated March 19, 1962, effective April 1, 1962, created a fieldwide unit for the Siphonina-Davisi 2 Sand and force pooled 60.5059 acres of the Miller Lease. (See Tract 20 on Df. Exh. D-11, annexed hereto). This unit is substantially the same as the Theall Field Top Structure Siphonina No. 2 Sand plat, dated October 1960, revised February 3, 1961, prepared after the drilling of The Ohio Oil Company-O'Neil Hebert Well (Pf. Exh. 12, annexed hereto). It is stipulated that the location of the sand is as shown in said order.

34. Conservation Order 367-D, dated March 19, 1962, effective April 1, 1962, created a fieldwide unit for the Siphonina-Davisi 3 Sand and force pooled 53.4176 acres of the Miller Lease. (See

Tract 23 on Df. Exh. D-12, annexed hereto). This unit is substantially the same as the Theall Field Top Structure Siphonina No. 3 Sand plat, dated October 1960, revised February 2, 1961 (Pf. Exh. 13, annexed hereto). It is stipulated that the location of the sand is as shown in said order.

35. A permit to drill a well in the Siphonina-Davisi 2, the Siphonina-Davisi 3, and the Siphonina-Davisi 4 Sands was obtained by the P. U. Broussard Heirs by Permit No. 67215, dated December 15, 1960, for permission to drill a well, given Serial No. 82629, at the location shown on Df. Exh. 14, which permit was renewed by renewal Number 2524, and an additional permit was taken out, being Permit Number 69665, for a proposed well at the same location, the well to bear Serial Number 85078, which permit was granted June 9, 1961 to P. U. Broussard Heirs, which was renewed under Renewal No. 2601, dated October 6, 1961, the location of the proposed well being in Section 6, Township 14 South, Range 3 East, from the northwest corner of Section 6 go south along the western line 660 feet, thence at right angles go east 430 feet to location, the proposed total depth being 12,900 in the zone or reservoir known as the S-2, S-3, S-4, the applicable Department of Conservation Orders being Order 29-B and 29-E (wildcat).

No well was ever drilled pursuant to the above referred to permits.

36. Counsel have agreed to the receipt in evidence of the following exhibits, all of which are made a part hereof by reference:

*Plaintiff's Exhibits:*

Pf. Ex. 1 Plat, Miller Lease Area, at time of lease, May 5, 1956.

Pf. Ex. 2 Plat, Miller Lease Area, one year later, May 5, 1957.

Pf. Ex. 3 Plat, Miller Lease Area, May 5, 1958.

Pf. Ex. 4 Plat, Miller Lease Area, May 5, 1959, time of end of contractual primary term of Miller Lease.

Pf. Ex. 5 Plat, Miller Lease Area, May 5, 1960.

Pf. Ex. 6 Plat, Miller Lease Area, May 5, 1961.

Pf. Ex. 7 Letter written by K. F. Hagemeier to plaintiff.

Pf. Ex. 8 Letter written by Ohio Oil Company to plaintiff, making reference to a geological data sheet and four gas reservoir maps, Theall Field, Vermilion Parish.

Pf. Ex. 9 Geological data sheet, to which reference is made in letter, Pf. Ex. 8.

Pf. Ex. 10 Map, dated October 1960 "Top Structure Cristellaria-6 Sand," (Miller Tract in pencil).

Pf. Ex. 11 Map, dated October 1960 "Top Structure Siphonina No. 1 Sand," (Miller Tract in pencil).

Pf. Ex. 12 Map, dated October 1960 "Top Structure Siphonina No. 2 Sand," (Miller Tract in pencil).

Pf. Ex. 13 Map, dated October 1960 "Top Structure Siphonina No. 3 Sand," (Miller Tract in pencil).

Pf. Ex. 14 Plat, showing proposed location of P. U. Broussard No. 1 Well, for which permit was issued by the Louisiana Department of Conservation.

Pf. Ex. 15 Plat, showing location of wells, the logs of which show the S.D. 4 Sand to which reference is made on the geological data sheet (Pf. Ex. 9, above).

Pf. Ex. 16 Gas Clearance dated June 5, 1958, covering the Walter Durke No. 1-D Well.

Pf. Ex. 17 Gas Clearance dated June 5, 1958, covering the Walter Durke No. 1 Well.

Pf. Ex. 18 Induction-electrical log, Walter Durke No. 1 Well.

Pf. Ex. 19 Induction-electrical log, Bernard Unit No. 1 Well.

Pf. Ex. 20 Induction-electrical log, O'Neil Hebert No. 1 Well.

Pf. Ex. 21 Induction-electrical log, Trice-Nunez et al No. 1 Well.

Pf. Ex. 22 Induction-electrical log, Trice-Nunez No. A-1 Well.

Pf. Ex. 23 Induction-electrical log, J. Sagrera No. 1 Well.

Pf. Ex. 24 Induction-electrical log, No. 1 Theall Well.

Pf. Ex. 25 Letter dated November 16, 1961, demanding that lease be released.

Pf. Ex. 26 Plaintiff's letter dated March 28, 1963 returning delay rental for period commencing May 5, 1958.

Pf. Ex. 27 Defendants' letter dated April 3, 1963 replying to plaintiff's letter of March 28, 1963.

*Defendants' Exhibits:*

Df. Ex. A Oil, Gas and Mineral Lease, dated May 5, 1956 granted by Preston J. Miller to Ted Weiner, referred to as the Miller Lease.

Df. Ex. B Affidavit of Ruth Wheelis, showing payment of rental due on May 5, 1957 and May 5, 1958, with copies of cancelled checks and depository banks' rental payment receipts attached.

Df. Ex. C Affidavit of Karl Hagemeier, showing well information for The Ohio Oil Company-Walter Durke No. 1 and No. 1-D Well, The Superior Oil Company-Bernard Unit No. 1 and 1-D Well, Trice Production Company-Nunez, et al Unit Relief Well No. 1-A, and The Ohio Oil Company-O'Neil Hebert No. 1 and No. 1-D Well, with plat attached.

Df. Ex. D-1 Conservation Order No. 367 establishing drilling and producing units for the Cristellaria-6 Sand.

Df. Ex. D-2 Conservation Order No. 367-1, denying the application of The Superior Oil Company for the revision of the Cristellaria-6 Sand Units.

Df. Ex. D-3 Conservation Order No. 367-A, establishing producing units for the Siphonina-Davisi 1 Sand.

Df. Ex. D-4 Conservation Order No. 367-2, authorizing co-mingling of the total well effluent from all wells in the Theall Field.

Df. Ex. D-5 Conservation Order No. 367-3, revising the units for the Cristellaria-6 Sand.

Df. Ex. D-6 Conservation Order No. 367-A-1, revising the units for the Siphonina-Davisi 1 Sand.

Df. Ex. D-7 Conservation Order No. 367-A-2, and supplement thereto, establishing an additional unit for the Siphonina-Davisi 1 Sand.

Df. Ex. D-8 Conservation Order No. 367-B, establishing a drilling and production unit for the Nunez Sand.

Df. Ex. D-9 Conservation Order No. 367-4, dissolving all drilling units previously established for the Cristellaria No. 6 Sand and establishing one unit for the entire Cristellaria No. 6 Sand Pool.

Df. Ex. D-10 Conservation Order No. 367-A-3, dissolving all drilling units previously established for the Siphonina-Davisi No. 1 Sand and establishing one unit for the entire Siphonina-Davisi No. 1 Sand Pool.

Df. Ex. D-11 Conservation Order No. 367-C, establishing one unit for the entire Siphonina-Davisi No. 2 Sand Pool.

Df. Ex. D-12 Conservation Order No. 367-D, establishing one unit for the entire Siphonina-Davisi No. 3 Sand Pool.

Df. Ex. E Affidavit by Karl Hagemeier, Division Manager of Texas Crude Oil Company, stating that the Trice Production Company 1-A Nunez, et al. Unit Relief Well was completed in the Siphonina-Davisi 1 Sand topped at 11,786 feet.

Df. Ex. F Affidavit by William Schmitz, Consulting Geologist of Lafayette, Louisiana, stating that the Trice No. 1-A Nunez et al.

Well is completed in the Siphonina-Davisi 1 Sand.

Df. Ex. I-1 Conservation Commission records showing location and other information concerning The Ohio Oil Company-Walter Durke Well.

Df. Ex. I-2 Conservation Commission Records showing location and other informtion concerning the Superior Oil Company-Bernard Well.

Df. Ex. I-3 Conservation Commission Records showing location and other information concerning the Trice Production Company-Nunez, et als. Well and Trice Production Company-Nunez, et al. Relief Well.

Df. Ex. I-4 Conservation Commission Records showing location and other information concerning The Ohio Oil Company-O'Neil Hebert Well.

Df. Ex. J. Affidavit of Karl Hagemeier stating that The Ohio Oil Company-O'Neil Hebert Well was dually completed in the Siphonina-Davisi 2 Sand and the Siphonina-Davisi 3 Sand, neither of which was produced until April 23, 1963.

Df. Ex. K Itemization of Royalty Payments made to Preston J. Miller.

Df. Ex. L Costs incurred in developing and producing P. J. Miller Lease to September 30, 1963.

37. At the time of the completion of the Nunez Relief Well in the SD-1 Sand every acre of the Miller Lease was included in units around wells completed in that sand and Miller was sharing in the production from the SD-1 Sand being produced from the Durke and Bernard wells.

38. Defendants did not enter into any pooling agreement in violation of Paragraph 10 of the lease.

39. No evidence has been presented to prove that defendants owed any obligation to plaintiff to pay royalty or lieu royalty from the O'Neil Hebert Well or to produce and market any gas from the SD-2 and SD-3 Sands of that well.

Additional findings will be included with the Court's discussion of and application of the law involved.

## DISCUSSION AND THE LAW

■ We are governed by the law of Louisiana.

■ It requires no extended discussion or analysis of the factual material here to eliminate three contentions of the plaintiff. Findings 38 and 39 dispose of the alleged breaches of Paragraphs 10 and 8B of the lease. Equally without merit is the argument that defendants violated Paragraph 7 by failing to drill an offset to the Trice-Nunez Relief Well. This well was completed on February 20, 1960. At that time every acre of the Miller Lease was included in units around wells in the SD-1 Sand and was sharing in the production from that sand as it was being produced from the Durke and Bernard Wells. Conservation Order 367-A (Df. Ex. D-3) which established the original units around these wells specifically provided:

"Not more than one well on each unit shall be allowed to produce from the Siphonina-Davisi 1 Sand of the Theall Field, Vermilion Parish.

■ The law is well settled that where the obligations of a lease are in conflict with the valid order of the Department of Conservation, the contractual obligations are superseded by the provisions of the Conservation Orders. Simmons v. Pure Oil Co., 124 So.2d 161 (La.App.2nd 1960, affirmed 241 La. 592, 129 So.2d 786; Delatte v. Woods, 232 La. 341, 94 So.2d 281 (1957). It is convincingly clear that Conservation Order 367-A relieved defendants from any obligation which might otherwise have been incurred under Paragraph 7 to drill an offset well or to pay compensatory royalty in lieu thereof.

The dispositive issues in this case are: (1) Did the lease terminate on May 5, 1958 because of the failure to pay a proper rental? (2) Did defendants breach the express drilling obligations of Para-

graph 6 of the lease? To these questions we now turn. Pertinent excerpts of provisions of the lease are:

"3. This lease shall terminate on the 5th day of May, 1957, unless on or before said date the Lessee either (1) commences the drilling (spudding in) of a well on the land, or on acreage pooled therewith after notice and hearing pursuant to an order of the Louisiana Department of Conservation, in search of oil, gas or other minerals and thereafter continues such operations and drilling to completion or abandonment; or (2) pays to the Lessor a rental of Three Thousand Nine Hundred and no/100 ($3,900.00) Dollars, which payment shall maintain Lessee's right in effect without drilling operations for one (1) year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling operations for successive twelve (12) month's period (during the primary term) by paying Lessor on or before the beginning of such respective periods Seven Thousand and Eight Hundred and no/100 ($7,800.00) Dollars for the land to be held hereunder by rental payments."

"6. If in the exercise of the rights herein granted, minerals be developed or produced in paying quantities in or on the premises or on acreage pooled therewith, the said Lessee binds itself to thereafter proceed with the drilling (spudding in) of another well on the premises or on acreage pooled therewith, within six (6) months from the date said last producer is brought in, and to so continue within said six-month periods until a full development of the property has been accomplished. Where an official unit or units of the Department of Conservation of the State of Louisiana have been established around any well or wells completed on the premises covered hereby, in lieu of the aforesaid drilling (spudding in) of a well within the six-month period, during the primary term of this lease, Lessee may maintain said lease in full force and effect as to all acreage not included in said unit or units by paying a proportionate rental as provided for in Paragraph 4 on the part of the acreage covered herein but not included in unit or units."

"10. * * * In the event a well producing oil or gas is drilled and completed on any portion of the lands herein described and there should be created around said well by the Louisiana Department of Conservation or other governmental authority a spacing or allocation unit, then in lieu of the royalty herein provided, Lessor shall be entitled to that portion of the ⅛th of the production from such well as the acreage herein leased and contained in said unit bears to the whole unit, in no event, however, shall Lessor receive less than one-half (½) of the one-sixth (⅙) of the production from the well contained in the unit of which the lands herein described form a part. This paragraph is subject to and is to be considered in the light of Paragraph 8E and the royalties payable shall be determined by the size of the unit as provided for in Paragraph 8E."

## IS PLAINTIFF ENTITLED TO CANCELLATION BECAUSE OF THE NONPAYMENT OF THE FULL DELAY RENTAL ON MAY 5, 1958?

On April 13, 1958 defendants paid $3,900 as the delay rental due under the lease for the period of May 5, 1958 to May 5, 1959. According to the unambiguous provisions of the lease the correct payment was $7,800. This was clearly set forth in dollars and cents. While preparing for trial of this case, plaintiff, in checking through his exhibits, caught this error and immediately (by letter of March 28, 1963) transmitted a check to defendants in the sum of $3,900 representing the return of the

delay rental. Defendants then returned the check to plaintiff with another check for $3,900 as an additional rental payment due for the period of May 5, 1958 to May 5, 1959. This check was accompanied with a letter containing an explanation that the defendants did not believe that any additional rental was due and contained a reservation of the right to have a judicial determination as to the proper amount of delay rental due for the period in question. Defendants then conceded $7,800 was the correct rental. Plaintiff refused to accept the tender made of the additional rental and has amended his complaint setting forth that the lease was at an end immediately upon the non-payment of the correct rental on May 25, 1958.

Defendants' brief of January 15, 1964, page 3, reads as follows:

"Defendants have since determined that the Durke Well was not placed on production until May 25, 1958 and concede that the rental due on May 5, 1958 was $7,800 as contended by plaintiff."

Following the submissions of briefs and during the Court's deliberation, it addressed two letters to counsel for plaintiff and defendants dated February 11th and 13th, requesting counsel's comment on certain issues of law. Defendants were given until March 10, 1964 to comment on these questions. A supplemental brief was filed on that date and therein defendants take a completely new and directly contradictory approach to what they previously urged concerning the correct rental. While these approaches are completely contradictory, we treat them as if they were alternative. We proceed to dispose of the issues as urged upon us prior to March 10th. Then, we will direct our attention to those of March 10th.

■ When the "unless" drilling clause is used, as it was here in Paragraph 3,

the lessee does not covenant to drill or pay. The failure of the lessee to drill or pay a stipulated sum of money ipso facto terminates the lease.[1] Under the facts of the instant case, no drilling operations having been commenced and defendants having failed to pay the required amount of rental due on May 5, 1958, the lease was at an end immediately upon the non-payment of the correct rental on May 5, 1958.

■ Counsel for defendants contends: (a) that the error was an innocent and reasonable mistake and plaintiff should now be required to allow defendants to rectify their error; (b) that petitioner has accepted royalty payments under the lease and is therefore estopped to deny its validity. The latter position is clearly without merit (Broussard v. Phillips Petroleum Company, 160 F.Supp. 905, affirmed per curiam 265 F.2d 221; language categorically approved and cited, and quoted from as being the law of Louisiana in Pierce v. Atlantic Refining Company, La.App., 140 So.2d 19, 23 (1962), certiorari denied June 4, 1962).

We pass to defendants' next defense: that the error was an innocent one—a mutual one—and that they should now (some five years later) be permitted to rectify it. In support of this defense, counsel cites and relies heavily on Jones v. Southern Natural Gas Co., 213 La. 1051, 36 So.2d 34 (1948) and Davis v. Laster, 242 La. 735, 138 So.2d 558 (1962).

■ These decisions have enunciated the principle that the right to dissolve a lease is subject to judicial control according to the circumstances. This idea is appealing, for it honestly concedes a breach but permits judicial control where the result would be onerous and the mistake is pardonable. Later decisions illustrate the reluctance of the Louisiana Supreme Court to apply this doctrine. (Atlantic Refining Company v. Shell Oil

---

1. Baker v. Potter, 1953, 223 La. 274, 65 So.2d 598; Amos v. Waggoner, 1956, 229 La. 134, 85 So.2d 58; Johnson v. Smallenberger, 1959, 237 La. 11, 110 So.2d 119; Rushing v. Griffin, 1960, 240 La.

31, 121 So.2d 229; Broussard v. Phillips Petroleum Co., 1958, D.C., 160 F. Supp. 905, affirmed per curiam 5 Cir., 265 F.2d 221.

Company, 217 La. 576, 46 So.2d 907 (1950); Johnson v. Smallenberger, 237 La. 11, 110 So.2d 119 (1959); Rushing v. Griffin, 240 La. 31, 121 So.2d 229 (1960); Broussard v. Phillips Petroleum Company, 160 F.Supp. 905, D.C.La.1958, affirmed 265 F.2d 221. Surely, great caution must be exercised in utilizing judicial power to revitalize an agreement that has been terminated by its own terms. In my judgment, the circumstances warranting the application of such power must appear of record with the greatest and most convincing clarity.

Surely, under the facts of this case, Jones and Laster are not controlling. Laster has no relevance and Jones is easily distinguishable. In Jones (supra) the original lease covered 518 acres, more or less, at an annual rental charge of $1.00 per acre. The lease provided that in the event of an assignment in whole or in part, the rental payments were to be apportioned ratably according to the surface area of each. The defendant became the assignee of a portion of the lease and on the due date for rental payment in 1944 deposited $300 to the credit of plaintiff, which amount was arrived at by defendant's computation that the area covered by its assignment comprised 300 acres (this was pegged on the reasonable assumption that a section contained the regulation 640 acres). Again, on the due date in 1945, the amount of $300 was deposited but shortly thereafter plaintiff sought a decree of forfeiture. There was and still is a grave question as to how much acreage was included in the assignment. Three different surveyors surveyed the land and each came up with a different result. One concluded that there were exactly 300 acres covered; one came up with the conclusion that there were 320 acres involved. Louisiana's Supreme Court, sharply divided, held that under those circumstances the mistake was normal, justified and innocent, and that equity

should intervene. But, the Court, in speaking of the likelihood of error in ascertaining the amount of acreage involved, was quick to point out:

" * * * this case is different from one where the lessor has stated in the lease, in dollars and cents, the exact amount of the annual rental which must be paid by the lessee, and where there has been no assignment of a segregated part of the land covered by the original lease."

The distinction pointed out by the Supreme Court in Jones and quoted above constitute precisely the facts of instant case where the amount of rental was pointed out in dollars and cents to be $7,800, and the lease was still intact in its entirety.

Laster certainly has no relevance here. There, the lease provided for payment of shut-in royalties rather than delay rentals after drilling operations had resulted in a shut-in well. There, the lessees erroneously tendered delay rentals rather than shut-in royalty payments, and the lessee accepted such rentals for nine years, and realized that it was accepting delay rentals. The Louisiana Supreme Court held that this constituted a modification of the contract and an agreement to accept delay rentals rather than shut-in royalty rentals. *It should be noted, too, that the delay rentals were much in excess of the shut-in rentals, and that the lessor was getting much more than he was entitled to under the contract.* No one can quarrel with the equitable result reached by the Court under those circumstances.

We emphasize that the circumstances warranting application of equity must appear with convincing clarity. Here, the lease stated in dollars and cents the exact amount of the annual rentals ($7,-800) and there had been no segregated part of the land covered by the lease. The payment of only $3,900 was not a likely or reasonable mistake.[2] Certain-

2. Defendants, in their pleadings, still insist no mistake was made and their tender was conditioned on that premise. They admit by brief that there was a mis-take; however, their pleadings still seek to avoid the payment of the additional rental on the basis of prescription.

ly, it was not a mutual mistake; it was clearly defendants' error. It is all too obvious that to relieve a party of such a patent error would be a dangerous precedent and would initiate a policy that would be most difficult to administer.

■ Defendants have paid to operators of wells on the units which include portions of the Miller Lease a total of some $125,063.11 as their share of the drilling and operation of those wells. Pegged on this fact, defendants put forward the argument that it would be most inequitable to cancel the lease. We reject this theory for several reasons. First, we reject it for much the same reasons which prompted the Supreme Court of Louisiana to reject it in Johnson v. Smallenberger (1959), 237 La. 11, 110 So.2d 119:

> "Under the facts of the instant case, the lease was at an end immediately upon non-payment of the rental due on May 6, 1956. According to the plain provisions of the type of contract known as the 'unless' lease, as universally interpreted, the lessee is under no duty either to drill or to pay delay rentals; if he either drills or pays, the lease remains in effect, but if he does neither, it ipso facto terminates at the time of default."

Secondly, we reject it because in the accounting that must be ordered, defendants are to be given full credit for this amount. Defendants have not drilled a single well anywhere. Rather than fulfilling their contractual obligations to drill, the defendants merely sat back and awaited eventual field unitization of the lease. When a portion of the lease was placed in a producing unit, defendants then paid their proportionate share of the cost incurred by a third party in drilling and producing the well. This was no risk—it was a "sure thing"— but when an accounting is made, defendants are to be given full credit for all amounts so expended.

We come now to the contention urged by defendants in their brief of March 10th. Defendants' answer filed on October 17, 1963 categorically alleged that the correct amount of rental due on May 5, 1958 was $3,900. However, in 1963 they tendered an additional $3,900 and asked for a judicial determination of whether the amount due in 1958 was $3,900 or $7,800. The correct amount due was spelled out in dollars and cents, both in numerals and letters, and by brief of January 15, 1964, defendants conceded that they had made a *factual* mistake in thinking that the Durke Well was placed on production prior to May 5, 1958, and that the correct rental was in truth $7,800. They argued that this was a pardonable factual error. Now, by brief of March 10, 1964, defendants reverse their position and allege they made an error of law and should not have paid any delay rental at all. The premise of this conclusion is that defendants were entitled to keep the entire lease in force during the primary term by making quarterly "lieu royalty" payments as provided in Article 8B of the lease. This is so, they say, because the Durke Well was spudded in on March 4, 1957; and on March 13, 1957, the North Half of the Miller Lease was placed on a unit around the Durke Well by an order of the Conservation Commissioner. The Durke Well was not produced until May 25, 1958. The argument is that the inclusion of the North Half of the Miller Lease in a unit with the Durke Well sufficed to keep the entire lease alive provided they had paid "lieu royalty." Defendants then point out that the "lieu rental" would be less than the incorrect delay rentals that were paid, and insists that the delay rentals be considered "lieu royalty." These very resourceful arguments are without merit.

The initial inquiry is: Did the drilling of the Durke Well by a third party on land not covered by the lease but later unitized with a part of it relieve lessor from the obligation of paying delay rentals to keep the lease alive? We think not.

■ A mineral lease is a contract which permits the lessee to explore for minerals on the land of the lessor in

consideration of certain commitments by lessee. All clauses of the lease are to be interpreted "the one by the other," giving to each the sense that results from the whole contract (LSA–C.C. Art. 1955). In interpreting an agreement the intention of the parties and the effect given to it must be ascertained (Simmons v. Hanson, 228 La. 440, 82 So.2d 757). In a doubtful case the agreement is interpreted against him who has contracted the obligation (LSA–C.C. Art. 1957; Robbert v. Equitable Life Assurance Society of the U. S., 217 La. 325, 46 So.2d 286).

This was not an ordinary lease contract but it did contain the not too unusual Pugh Clause (See Paragraph 9):

"* * * provided no portion of the leased premises shall be retained under a spacing or allocation order of the Louisiana Department of Conservation other than that portion located within the unit or units which have at that time been formed by the Louisiana Department of Conservation, and the inclusion of a portion of the lands herein leased in a unit or units shall not be deemed sufficient to hold the remainder of the lands not included in said units without the compliance with the requirements of this lease for the retention of the privileges herein granted, * * *"

This language is unambiguous. (See Broussard v. Phillips Petroleum Company, 160 F.Supp. 905, affirmed 265 F.2d 221, Fifth Circuit). Its effect is to divide and segregate the lease once a portion of it is taken into a unit. When the North Half was taken into a unit, this could not relieve defendants of the obligation to pay the rental on the South Half. Accepting defendants' theory that the spudding or the completion of Durke resulted in the obligation to pay in lieu royalties (which they did not pay), then in May of 1958 there would have been due a delay rental of $3,900 (South Half

of lease) plus in lieu royalty payments (North Half of lease).

There are more compelling reasons why the drilling of Durke did not relieve defendants of their obligation to pay delay rentals.[3] We refer against to pertinent parts of Paragraph 3:

"This lease shall terminate on the 5th day of May, 1957, unless on or before said date the lessee, either (1) commences the drilling (spudding in) of a well on the land, or on acreage pooled therewith after notice and hearing pursuant to an order of the Louisiana Department of Conservation, in search of oil, gas or other minerals and thereafter continues such operations and drilling to completion or abandonment; or (2) pays to the Lessor a rental of Three Thousand Nine Hundred and No/100 ($3,900.00) Dollars, which payment shall maintain Lessee's right in effect without drilling operations for one (1) year from the date last above mentioned; and Lessee may continue to maintain the rights granted without drilling operations for successive twelve (12) months' period (during the primary term) by paying Lessor on or before the beginning of such respective periods Seven Thousand Eight Hundred and No/100 ($7,800.00) Dollars for the land to be held hereunder by rental payments."

■ The language is definite. This is not an Odom ([Odom v. Union Producing Company] 141 So.2d 649) lease. Unlike the lease here, the Odom lease authorized pooling after production and did not require as here that the drilling (spudding in) be after notice, after hearing, and after the issuance of the unitization order. There, the *lessee drilled* the well, timely delay rentals were paid throughout the primary term, timely "lieu royalty" payments were tendered thereafter, the lease authorized voluntary pooling *after* production. On this phase

3. Prior to March 10, 1964 no one had ever made this contention before, and there was a clear meeting of the minds between all the parties that the obligation was to pay rentals.

of the instant case it is similar to Wilcox ([Wilcox v. Shell Oil Company] 226 La. 417, 76 So.2d 416), where the lease required that the pooling take place prior to drilling. Paragraph 3 of the instant lease expressly provides that the drilling (spudding in) must be after notice, after the hearing, and after the order of the Conservation Department. Here, the Durke Well was spudded in by a third party on land *then* not unitized with any portion of this lease. It was spudded in on March 4, 1957 and the Conservation Order was not issued until March 13, 1957. Under these facts and the unequivocal terms of the lease, the rights granted could be kept alive only by paying the specified delay rentals.

Then, too, of critical importance is the fact that Paragraph 3 requires that the Lessee do certain things in order to keep the lease alive—not a third party. This Lessee did not, prior to May 5, 1957, commence the drilling of a well on the leased land. This Lessee did not, prior to May 5, 1957, commence a well on acreage pooled with the leased land. Neither this Lessee nor any assignee ever drilled a well on this lease. Neither this Lessee nor any assignee ever drilled a well on acreage unitized with any portion of this lease. In the absence of drilling, the Lessee's only way to keep the lease alive was to pay the proper delay rentals.

However, assuming to be true that which is not true—namely, that defendants had a right to keep this lease alive after the drilling of the Durke Well without paying delay rentals—they could fare no better. Paragraph 8B which they rely on categorically states that:

"If such payment is made or tendered, it will be considered that gas is being produced."

In the Odom case the proper delay rentals were paid throughout the primary term of the lease and thereafter the proper lieu royalty was tendered. Here, no payment or tender of such lieu royalty has ever been made. Therefore, under the very terms of the clause they rely on, there was neither actual production nor constructive production to maintain the lease in force beyond its primary term.

Laster, 138 So.2d 558, is authority for the proposition that during the primary term of that specific lease it could not be maintained by paying delay rentals rather than lieu royalties because under the terms of that lease "lieu royalties" were required to be paid rather than delay rentals. The Miller Lease and the facts here involved, for reasons aforesaid, required delay rentals and Laster is not relevant.

What has been said should dispose of the matter, but it is well to add that in Laster, where the Lessee had paid the proper delay rentals throughout the entire primary term, and then after the primary term tendered "lieu royalty," the Court denied cancellation on equitable grounds. No such equitable considerations exist here. There, proper delay rentals were paid throughout the entire primary term; the Lessee drilled a well on the leased premises; the Lessee drilled two other wells in the immediate area in an effort to develop the subject property; the Lessor spent some $400,-000 in an effort to find additional gas production in the area. The Court was anxious under those circumstances to apply equity.

I have no doubt as to the true intention of the parties. We conclude that the Miller Lease terminated by its own terms on May 5, 1958. As of that date there was no production from the lease or from a well unitized with it [4] and it is clear that defendants are not entitled to retain any acreage of the lease.

This conclusion makes it unnecessary to inquire into plaintiff's contention that defendants breached Paragraph 6 and for that reason alone the lease must be

4. There must be actual production in progress at the time of expiration of the primary term in order that the life of a lease may be continued beyond the primary term. Landry v. Flaitz (1963), 245 La. 223, 157 So.2d 892.

cancelled. However, because the issue may have some relevance on the equities involved, we briefly turn our attention to it.

### DID DEFENDANTS BREACH PARAGRAPH SIX?

Plaintiff insists that Paragraph 6 required defendants to drill a well on the lease within six (6) months after completion of each of these wells:

(1) The Ohio Oil Company-Durke Well dually completed as a gas well on April 12, 1957 in the SD-1 Sand and the C-6 Sand (Paragraphs II and IV, Stipulation of Facts);

(2) The Superior Oil Company-Bernard Well dually completed as a gas well on September 4, 1958 in the SD-1 Sand and the C-6 Sand (Paragraph XIV, Stipulation of Facts);

(3) The Trice Production Company-Nunez et al. Relief Well completed as a gas well on February 25, 1960 in the SD-1 Sand Paragraph XVIII and Paragraph XX, Stipulation of Facts);

(4) The Ohio Oil Company-O'Neil Hebert Well dually completed as a gas well on January 12, 1961 in the SD-2 Sand and the SD-3 Sand (Paragraph XXI, Stipulation of Facts).

Defendants argue that the drilling and completion of these wells "did not trigger the drilling obligation of Paragraph 6."

The Durke well was completed on April 12, 1957. It was then apparent that this 78-acre lease was located in a gas area, and that defendants' only hope for making a profit was to pay the delay rentals and hope that the lease would be included in units around other wells being drilled in the vicinity. This was so because of an unusual and interesting provision in Paragraph 10 of the lease:

" * * * In the event a well producing oil or gas is drilled and completed on any portion of the lands herein described and there should be created around said well by the Louisiana Department of Conservation or other governmental authority a spacing or allocation unit, then in lieu of the royalty herein provided, Lessor shall be entitled to that portion of the ⅛th of the production from such well as the acreage herein leased and contained in said unit bears to the whole unit, in no event, however, shall Lessor receive less than one-half (½) of the one-sixth (⅙) of the production from the well contained in the unit of which the lands herein described form a part. This paragraph is subject to and is to be considered in the light of Paragraph 8E and the royalties payable shall be determined by the size of the unit as provided for in Paragraph 8E."

Paragraph 8E provides for a royalty of one-fourth (¼) where a Conservation Order fixed a unit in excess of 240 acres around any gas well drilled on the leased premises. Since all of the Conservation units exceeded 240 acres, under the above quoted provision of Paragraph 10, defendants would have been required to pay plaintiff a royalty of 12½% of all production from each unit well had the unit well been located on the leased premises. The following table illustrates the impossible situation which would have existed had defendants drilled on the leased premises:

| Producing Horizon | Share of Miller Tract in Total Production | Plaintiff's share of Total Production under Par. 10 of Lease |
| --- | --- | --- |
| C-6 Sand | 2.01877% (Df.Ex.D–9) | 12½% |
| SD-1 Sand | 6.01687% (Df.Ex.D–10) | 12½% |
| SD-2 Sand | 7.41679% (Df.Ex.D–11) | 12½% |
| SD-3 Sand | 3.24257% (Df.Ex.D–12) | 12½% |

It can be seen from the above figures that had each unit well been drilled on the leased premises, defendants would have had to pay to plaintiff as royalty anywhere from almost twice to almost six times the total income received by defendants from the leased premises. It is no wonder that defendants did not drill on the leased premises. The undeniable fact is that with only 78 acres included in the lease, the form of the lease was just not suitable for operations in a gas area.

 Defendants argue that the drilling obligations of Paragraph 6 taken together with the royalty provisions of Paragraph 10 are inequitable. That may be so, but these mature and experienced people knew what they were doing. It is fundamental in Louisiana law that all legal agreements have the effect of law upon the parties, and they are bound by their agreement, regardless of harsh consequences, provided the agreement is not contra bonos mores or in violation of some prohibitory law. (Articles 1900, 1945 and 1764, LSA–C.C.). Here, the parties to the lease contract expressly stipulated and agreed as to this contract and it does not contain any provision which is contra bonos mores or in violation of some prohibitory law. It must be enforced as written, and by its very terms defendants were not given the option of riding it out, but were required either to drill or to give up their lease.

 Defendants interpret Paragraph 6 as triggering a drilling obligation only when *they* drill a well on the leased premises or on land pooled with it. By brief they say: "Surely it could not be construed to impose an obligation on the defendants because other lessees have drilled wells on other leases and a portion of the Miller Lease is included in units around such other wells."

We take a different view of the unequivocal language of Paragraph 6:

"If in the exercise of the rights herein granted minerals be developed or produced in paying quantities in or on the premises *or on acreage*

*pooled therewith,* the said lessee binds itself to thereafter proceed with the drilling of another well on the premises or on acreage pooled therewith within six (6) months * * *." (Emphasis added)

Paragraphs 6 and 3 must be read together. Assuming proper delay rentals had been paid, the obligation to drill would have been postponed until six months after May 5, 1959. Had the rentals been properly paid, as of November 5, 1959, there was an obligation to proceed with another well as a result of the production of the Durke and Bernard Wells. A similar obligation existed six months after production from the Nunez Well. We cannot read the language of Paragraph 6 any other way. Defendants breached these obligations. These breaches cannot be rationalized and do not help their equitable position as they seek to resuscitate the dead lease.

 There is agreement that the failure to pay the proper delay rental terminates the lease without the necessity of a putting into default. This is the law everywhere. However, there is conflict in the jurisprudence concerning the necessity of putting in default where there is a breach of the drilling obligation. We leave aside confusing digressions concerning this, but it would seem that because of the automatic termination clause in Paragraph 20 of this lease that it would not have been necessary to place defendants in default before invoking the breach of Paragraph 6 (Godfrey v. Lowery, 223 La. 163, 65 So.2d 124; Wadkins v. Wilson Oil Corporation, 199 La. 656, 6 So.2d 720). This Court refused to cancel leases for various reasons in Bonsall v. Humble, Oil & Refining Co., D.C., 201 F.Supp. 516, aff. 5 Cir., 300 F.2d 150, cert. denied 371 U. S. 816, 83 S.Ct. 29, 9 L.Ed.2d 57; Touchet v. Humble Oil & Refining Co., D.C., 191 F.Supp. 291; Billeaud Planters, Inc. v. Union Oil Co., D.C., 144 F.Supp. 564, aff. 5 Cir., 245 F.2d 14. It is conceded that these cases are not applicable to the instant case because the leases there involved contained provisions requiring

the lessor to notify the lessee in the event he thought that the lessee was not complying with the obligations of the lease and to give the lessee a reasonable time within which to comply prior to bringing a suit for cancellation. However, our holding here is not bottomed on the breach of the drilling obligations. This opinion has been lengthy but its thesis is simple: The lease was at an end immediately upon non-payment of the proper rental on May 5, 1958. According to the plain provisions of this "unless" lease, as universally interpreted, the lessee is under no duty to either drill or pay; if he either drills or pays, the lease remains in effect, but if he does neither, it ipso facto terminates. The mere discovery of oil and unitization does not suffice. There must be production.

## THE ACCOUNTING

 Plaintiff argues that defendants are not entitled to credit for the sums paid and owed by them to the unit operator for the cost of completing and operating the unit wells. We disagree. Yet, we find no case involving the precise question. Plaintiff insists that defendants were in bad faith and that they deliberately and wilfully violated the drilling obligations imposed upon them. There can be no serious question that they did violate the drilling obligations. However, on this record I do not believe them to have been in bad faith. Our conclusion is that the defendants are entitled to credit for the sums paid and owing by them to the unit operator. Support for this holding is found in Article 21 of the Louisiana Civil Code which provides that where positive law is silent, the judge is to proceed and decide according to equity. Allen et al. v. Shreveport Mut. Bldg. Ass'n, 183 La. 521, 525, 164 So. 328, 329 (1935). See also Siegel v. Helis et al., 186 La. 506, 172 So. 768 (1937); Rhodes v. Miller, 189 La. 288, 179 So. 430 (1938). As pointed out in the Allen case:

"The true test to be applied, in all cases where the law is silent as to the remedy invoked but does not forbid it, is whether the ends of justice for the administration of which courts are established will be promoted by the enforcement of the remedy."

Further support for the right of defendants to this credit is found in Art. 1965 of the Louisiana Civil Code which provides that no one ought to enrich himself at another's expense and the *Restatement of the Law,* on the subject of "Restitution," Page 12, which states:

"A person who has been unjustly enriched at the expense of another is required to make restitution to the other."

Judge Dawkins of this Court recognized the above principles in the case of Johnson v. Mansfield Hardwood Lumber Company, 143 F.Supp. 826 (W.D.La.1956). The right of a lessee to an accounting, in the event of cancellation of a lease for breach thereof was recognized by the Louisiana Supreme Court in Davies v. Texarkana Crude Oil Co., 154 La. 424, 97 So. 597 (1923)

## CONCLUSION AND JUDGMENT

It is ordered that there be judgment herein in favor of Preston J. Miller and against all defendants, decreeing that the oil, gas and mineral lease granted May 5, 1956 by Preston J. Miller to Ted Weiner, recorded on May 12, 1956 in Book 316 at page 254, et seq., under entry number 130318 of the Conveyance Records of Vermilion Parish, has terminated and expired and the same is ordered cancelled from said records.

It is further ordered that defendants proceed forthwith to account to Preston J. Miller for all moneys derived by them under that lease after May 5, 1958.

It is further ordered that plaintiff be awarded $2,500 as a reasonable attorney's fee for the bringing and prosecution of this suit in the District Court. LSA–R.S. 30:102.

This is a final judgment.